## JOHN GARDNER v. STATE DEPARTMENT OF HIGHWAYS.[1]

February 13, 1937.

No. 30,964.

W. S. *Foster* and R. C. *Andrews,* for relator.

*William S. Ervin,* Attorney General, and *Ordner T. Bundlie,* Deputy Attorney General, for respondent.

LORING, JUSTICE.

*Certiorari* to review a decision of the industrial commission.

The relator, on October 22, 1934, filed a petition for compensation alleging that he was suffering from a disability which was the result of an accident that occurred while he was an employe of the Minnesota State Highway Department. The case was tried before a referee and was determined adversely to the petitioner. Upon appeal to the industrial commission, the decision of the referee was affirmed, and relator comes here.

[1]Reported in 271 N. W. 597.

The material facts are not in dispute. In the latter part of July, 1929, relator, at that time 53 years old, was working with a crew employed by the department of highways testing a farm near Milaca for gravel. For that purpose the crew had sunk a pit about four feet square and some 24 or 25 feet deep. Wooden curbing had been placed against the sides of the pit to prevent the gravel from sliding, and relator was engaged in removing this curbing. He was standing upright at the bottom of the pit when the side caved in upon him and buried him in sand and gravel up to about his fourth rib. Over the pit was a windlass with a rope attached. The rope was lowered by means of the windlass to relator, and he took hold of it and the men above operated the windlass in an attempt to lift relator out. This proved futile, and relator's son Gerald descended into the pit and placed the rope under his father's arms. Two coemployes at the top began to operate the windlass again, but the rope cut into relator's body, so it was padded with a coat. Relator seemed to think that he was done for and to expect a further cave-in and begged his son to save himself and leave him to die where he was because apparently it was impossible to extricate relator from the gravel. Finally, after about 20 minutes of effort, the relator was extricated by means of the windlass and lifted out of the pit. He was then slightly hysterical and had a pain through his chest. However, he proceeded to go with the men to a spot a short distance away where the crew ate its lunch. Relator did not eat. Soon after relator was pulled out of the pit the gravel again caved in with a loud noise.

Relator stayed with the crew that afternoon, but that evening he and his son decided not to continue on the job. Sometime after, the exact time is in dispute, relator began to show evidence of a heart ailment. In the fall or early winter following the accident, relator had a heart seizure when arising in the morning. The doctor who examined him at that time found that relator's heart was "bad, skipping and leaking." He has since had several heart seizures and a cerebral hemorrhage.

Mrs. Gardner, relator's wife, first saw her husband on August 10 following the accident. She is a practical nurse. Shortly after

that date she counted relator's pulse and found it very irregular. It is conceded that at the present time relator is suffering from auricular fibrillation and coronary arteriosclerosis. There seems to be little question but that at the time of the accident relator had a general and a coronary arteriosclerosis.

It is relator's contention that the accident brought about the auricular fibrillation and hastened the present disability. Before the accident relator presented the appearance of a man in good health and was an efficient and industrious manual laborer. He has not done any considerable amount of work since the accident, although there is some evidence that he helped in digging a sewer and contracted for wrecking a house. It is his claim that since the accident he has earned but $75 or $100. There is no serious claim that he is not totally disabled.

There is a sharp contradiction between the medical testimony of the two litigants as to the causal connection between the accident and relator's disability. Relator's doctors were of the opinion that the causal connection was clearly established, but in view of the commission's findings we are obliged to view the facts in a light most favorable to respondent. Lundeen v. Kaplan Paper Box Co. 196 Minn. 100, 264 N. W. 435. Our duty is, however, to determine whether or not there was sufficient evidence to substantiate the decision.

It is relator's contention that respondent's medical experts based their opinions on the absence of symptoms that were conclusively shown to be present. However, respondent's attorney asked Dr. Dunn:

Q. "Now, doctor, taking into consideration the history of the case and the hypothetical question based upon facts and the testimony you heard yesterday, have you arrived at any conclusion as to the connection, if any, between the present condition of Mr. Gardner and the alleged accident in 1929? * * *

A. "It is my opinion that there is no connection between the occurrence in July and his cardiac condition. * * * The condition of his heart at the present time is, in my opinion, essentially a diseased condition. * * * If any damage was done to the

heart it, in my opinion, should certainly have manifested itself immediately following the accident and not have developed and become obvious at a period some time after the accident."

On cross-examination relator's counsel asked Dr. Dunn:

Q. "Assume, doctor, * * * that immediately after the accident he was hysterical for a little while, that he trembled and laughed a great deal, that he walked a short distance over to where the men were to have their dinner, and that he did not eat any dinner, was unable to do so, and that he came back to the place where the accident occurred that same afternoon and stayed there, attempting to work but not being able to do very much, and assume that within a comparatively short time after the accident, a few weeks, he manifested a tired feeling, feeling of inability to work, a rapid and irregular pulse, jumpy pulse and shortness of breath which subsequently seemed to be progressively worse and which was marked and noticeable after exertion, how would you account for that condition, doctor, except on the supposition that the strain on his heart muscles, due to his being extricated as we have assumed him to be from this gravel well, caused his condition?

A. "My feeling about it is that if any damage had taken place to the heart he would have exhibited much more severe immediate symptoms than I have heard any history of."

The question quoted immediately above and others subsequently propounded to that doctor took as favorable a view of the evidence in favor of relator's claim as the record warrants. The answers were unequivocally negative as to any causal connection between the accident and relator's disability. The same may be said of the testimony of Dr. Rizer. After a long hypothetical question in which were incorporated all the facts favorable to relator's contention, Dr. Rizer was asked:

Q. "Whether it is possible Mr. Gardner's condition might have been caused by this accident?

A. "I don't think it is at all, and I think it has absolutely no connection. * * *"

Dr. Fahr, who had the same history before him, said:

"My opinion is even more convinced than previously that the accident had nothing to do with his present condition."

It was the consensus of opinion of these medical men that relator's condition is the result of the natural progress of the disease relator was afflicted with before the accident.

It was the opinion of the respondent's doctors that had there been any injury to the heart in the accident there would have been an immediate manifestation of the symptoms. As one doctor expressed it:

"They would have come at once; just as if the man had fallen and broken his leg he would not have been able to walk on it. This would have been a disabling condition at once."

At least one of the respondent's doctors adequately explained the reasons on which his opinion was based. To quote further from the record would serve no useful purpose. The quoted testimony is sufficient to support the commission's findings and decision. To reverse there must have been no evidence reasonably tending to support the decision. Such is not the case.

Affirmed.

MR. JUSTICE STONE and MR. JUSTICE PETERSON took no part in the consideration or decision of this case.