# DENNIS CASEY v. NORTHERN STATES POWER COMPANY AND ANOTHER.

77 N. W. (2d) 67.

May 11, 1956—No. 36,740.

*John A. Goldie* and *Samuel I. Sigal,* for relator.
*Charles H. Weyl,* for respondents.

NELSON, JUSTICE.

Certiorari upon the relation of employee to review an order of the Industrial Commission, one commissioner dissenting, affirming the findings of a referee fixing the percentage of disability of employee under workmen's compensation and finding that he is entitled to no further medical treatment under M. S. A. 1949, § 176.15, providing for medical and surgical treatment to cure and relieve from the effects of the injury.[1] The question on review is whether the

[1]M. S. A. 176.15 was repealed by L. 1953, c. 755, and replaced by section 13 thereof. Section 13, now M. S. A. 176.135, provides in part:

"Subdivision 1. The employer shall furnish such medical, surgical and hospital treatment, including nursing, medicines, medical and surgical sup-

record contains evidence of such nature as to require this court to direct findings more favorable to the employee.

Employee lists the following assignments of error:

"1. The decision of the Commission majority is unwarranted by the evidence, and is not in conformity with the terms of the Workmen's Compensation Act.

"2. The Commission majority erred in awarding compensation, based upon and limited to a finding of 30% permanent partial disability of the back, and in finding that relator is entitled to no further medical treatment, in that there is no evidence, much less 'competent' evidence, to support such findings or determination."

■ No general rule can be laid down which covers all situations. Each case must depend to a great extent upon its own particular facts. It is the well-established policy of this court that the Workmen's Compensation Act must be given a broad construction in the interest of workmen to carry out its policy. 6 Dunnell, Dig. & Supp. § 10385. The question before us on this review is whether the decision of the referee affirmed by the commission is wrong as a matter of law. We have made it plain that our function is not to say whether on the facts the decision of the Industrial Commission is correct or even preferable to another, but rather, and only, to ascertain whether it has sufficient basis of inference reasonably to be drawn from the facts; unless we can say there is no such basis, a reversal would be a transgression of our proper function of review as distinguished from that of initial decision of determinative fact issues. Jensvold v. Kunz Oil Co. 190 Minn. 41, 250 N. W. 815; Green v. County of Chippewa, 189 Minn. 627, 250 N. W. 679; Chillstrom v. Trojan Seed Co. 242 Minn. 471, 65 N. W. (2d) 888; Jurich v. Cleve-

---

plies, crutches and apparatus, including artificial members, or, at the option of the employe, if the employer has not filed notice as hereinafter provided, Christian Science treatment in lieu of medical treatment, medicine and medical supplies, as may reasonably be required *at the time of the injury and any time thereafter to cure and relieve from the effects of the injury. Such treatment shall include treatments necessary to physical rehabilitation. * * *"* (Italics supplied.)

land-Cliffs Iron Co. 233 Minn. 108, 46 N. W. (2d) 237; 6 Dunnell, Dig. & Supp. § 10426.[2]

■ We have consistently held to the view that a finding upon a question of fact cannot be disturbed unless consideration of the evidence and the inferences permissible therefrom clearly requires reasonable minds to adopt a conclusion contrary to the one at which the commission arrived. Furlong v. Northwestern Casket Co. 190 Minn. 552, 252 N. W. 656; Jones v. Excelsior Laundry Co. 183 Minn. 531, 237 N. W. 419.

■ Whenever on review this court must determine whether the facts and the reasonable inferences to be drawn therefrom sustain the findings of the commission, the evidence must be viewed in the light most favorable to such findings. Castle v. City of Stillwater, 235 Minn. 502, 51 N. W. (2d) 370; Schmoll v. J. W. Craig Co. 228 Minn. 429, 37 N. W. (2d) 539.

The particular facts as disclosed by the record are that Dennis Casey was in the employ of the Northern States Power Company and had been continuously employed by that company since August 1, 1914. He continued in the company's employ until April 30, 1954, when he was retired on pension at the age of 65 years. He was injured while working as a carpenter in the generation department of employer's Riverside station in Minneapolis August 18, 1950. He was at the time 61 years of age.

According to employee's testimony the accident causing the injury occurred while he was engaged, with another fellow employee, in installing steel sash about 18 feet above the ground and on top of a walkway or platform. He was required to kneel down on both knees to fasten screws in order to keep the safety scaffold from wiggling. While he was in that position, another employee accidentally applied a jerk to the scaffolding. The result was that a 2 by 12 plank, 10 feet long and weighing from 60 to 80 pounds, came loose and slipped down, falling about 10 feet "with a swing and a drop at the same time." The end of the plank struck employee in the lower lumbar

[2]The rule applies though findings are concurred in by only a majority of the commissioners. See, Fahey v. Terp, 235 Minn. 432, 51 N. W. (2d) 273.

region of the back. The blow knocked the wind out of him for a moment and caused a sharp pain in the back.

The accident occurred on a Friday. The following Saturday and Sunday were his days off. He was stiff and sore. He tried to "doctor" himself up. His wife rubbed liniment on his back. On the Monday morning following, he reported to the company doctor, Dr. R. F. McGandy, who examined him and advised him to put hot packs on his back and apply oil of wintergreen. He reported back to the job but did not work. He "just sat around."

Employee, as a member of the Electrical Workers Union, Local 160, was covered by a collective bargaining agreement, which provided that, in the event an employee who has been employed for one year or more is injured while performing work for the company, the company shall reimburse the employee the difference between the workmen's compensation received and his regular wage. Under this agreement, therefore, employee received his full wage, despite his disability, from the time he was first disabled up to April 30, 1954, the date he was retired on pension.

Employee said he was allowed to "soldier" on the job until his pension time came. He was discharged from treatment by the company doctor on September 8, 1951.

There is a discrepancy as to dates and in some other respects between the testimony of employee and that of the company doctor, Dr. McGandy, the latter testifying that employee first came to his office about his injury August 29, 1950, 11 days after the occurrence, and that in relating the history of the accident said to him that over a week before a plank slid a distance of a few feet striking his spine to the left of the same in the small of the lumbar region, or at a level of the third or fourth lumbar vertebra. The doctor's testimony is that he felt he was dealing with a contusion. Employee's next call was August 31, 1950, when an X-ray was taken, Dr. McGandy thinking that employee might have a transverse process fracture. No fracture was found. The next call was September 8, 1950, when he was some better. Employee was seen by the company doctor intermittently until March of 1952. In February 1951 he

asked for a brace and this was arranged for. Employee weighed about 216 pounds at the time and Dr. McGandy wanted him to reduce; this he found difficult. He was better and worse at times and said he thought the weather had something to do with it. He also told the doctor that he thought he had to bend or stoop or lift too much. Dr. McGandy said it did not seem to him to be a severe injury. His testimony discloses that he found an arthritic spine, sclerotic bone, a lordosis, and slight kyphosis, not connected with the accident of which employee complained and, further, that employee had a typical workingman's back. The same company doctor had examined him for transfer from construction to the Riverside station as carpenter in 1930 and pronounced him in good condition for the change in work at that time, in which work he continued until retirement.

The record also discloses that, prior to entering the employ of this employer in August 1914, employee had recovered from a railroad accident resulting in an injury to his left side. This had laid him up for nearly a year. In 1934 or 1935 he threw one of his hips out of place and was laid up for a short period. He was disabled for a few days in 1944 due to a kink in the back which came on while digging. In June 1947 he developed a sore left shoulder, neck, and upper back which continued and which resulted in Dr. McGandy's sending him to a Dr. Hannah on July 8, 1947.

In February 1952 Dr. McGandy referred employee to Drs. Evans and Reiley for examination. Dr. Edward F. Evans made his report February 18, 1952, and a supplemental one February 25, 1952. The same Dr. Evans again examined employee March 5, 1954, and made his last report as of that date. Dr. M. Z. Goldner examined employee January 19, 1954, at employee's request and made his report. By stipulation between parties to the proceeding, the reports of Drs. Evans and Reiley and Dr. Goldner were received in evidence with the same force and effect as if personally present and testifying at the hearing before the referee. The referee issued an order appointing Dr. John Galloway as neutral physician to make an examina-

tion of employee and to file his report, which he did under date of July 13, 1954.

Following a recital of the history given by employee to Dr. Evans, and of findings on preliminary physical examination, his report concludes as follows:

"X-rays: X-rays taken this date in the office of Dr. M. B. Hanson are reported as follows:

"AP and lateral films were made of the lumbar spine on 2-18-52. These show slight generalized osteoporosis in the lumbar spine. They are moderate hypertrophic changes in the lumbar spine. There is no evidence of bone injury in the lumbar spine. There is questionable narrowing of the bodies of the 11th and 12th dorsal vertebra.

"AP films were made of the pelvis, including both hip joints on 2-18-52. These show proliferative changes adjacent to the superior posterior margin of the acetabulum on the right side, suggesting possibly an old trauma to the right acetabulum. Pelvis otherwise negative.

"Diagnosis: Clinically, compression fractures as outlined on the X-ray report, plus rather extreme hypertrophic changes.

"Discussion: This represents an elderly man who has suffered rather severe injury to his back, followed by pain, which is not progressive, but which gives the patient trouble when he attempts to perform certain movement, mainly heavy lifting and twisting to either side and lifting, which he is not very willing to accept. He is used to doing fairly heavy work and fairly heavy lifting, plus considerable bending, twisting and stooping. He is wearing a lumbosacral support, which he admits gives him considerable support and indeed as long as he confines his activities to light work and does not attempt any of the movements which he knows aggravate his condition he gets along quite well. He is comfortable in a standing or lying position, but does have strain and soreness on sitting for long periods of time. There is no doubt that his injury is permanent one and the patient will have to realine his activities to suit the condition of his back. Any procedure of a surgical nature, which would give the patient any measure of relief, would consist of a

rather extensive spinal fusion which we do not feel is indicated in a patient this age or a support which is adequate to give the patient additional support for the ordinary activities. It is our feeling that conservative treatment is a treatment of choice. The patient himself admits that as long as he confines his activity to within ranges of his comfort that he is perfectly comfortable and does not desire any radical treatment."

Dr. Evan's supplemental report of February 25, 1952, was as follows:

"It is recognized that the X-ray evidence of compression is old and antedated of the alleged injury. This is one of those cases of exacerbation and the development of cognizance to limited disability. In view of the fact the patient is wearing a supporting belt, and is limited in his activities, I feel he carries approximately 25 per cent loss of use of the back. We do not feel this represents a disc problem but rather an irritative phenomena arising out of a long standing static and arthritic change."

Dr. Evans concludes his report of March 5, 1954, with the following statement:

"Reference is made to our report of 18 February, 1952 and 25 February, 1952.

"This is one of those individuals of advanced years whose hypertrophic arthritis and other disabilities have finally caught up with him. Reference is made to our previous report estimating 25 per cent permanent partial disability out of the accident itself and it is my feeling that this is not changed. The progressive changes and increase in disability arise out of progressive senile changes. It is felt that the individual has gone through all his severe emotional strain recently which, of course, has aggravated to some extent his reaction to his basic physical disabilities and we further feel that if any work can be given to this man of sedentary type so that he could work out his time for retirement, it would be fine for the patient. *No other active treatment is indicated."* (Italics supplied.)

The neutral physician, Dr. Galloway, upon his examination of employee, in his report to the Industrial Commission found all the structural changes referred to in the testimony of Dr. McGandy, the company physician, and the reports of Dr. Evans, and states that in his opinion they "were certainly present before the injury in 1950" which antedated his examination by 4 years.

The report of Dr. Goldner who examined employee at his request bears date February 1, 1954. He was given the same history of the accident as employee gave in his testimony. After stating his findings on preliminary physical examination, he reports as follows:

"X-ray examination: A-P, lateral and lateral spot films of the lumbosacral spine and pelvis show no destructive lesions. There is an increase in the lumbar lordotic curve and hypertrophic changes are noted. The hip joints are clear.

"Conclusions: If the facts as given to me by this man are correct, he had no significant trouble with his spine prior to the injury of August 18, 1950. Prior to that time he had worked for Northern States Power for thirty-some years without back difficulty. Following the injury of August 18, 1950, he has had more or less constant trouble with his lumbar spine region in varying degrees of intensity. Since August of 1950 he has not been able to carry on with his regular duties consistently and has on frequent occasions had to stop working before the day was over, because his back would cause him trouble. During this period of $3\frac{1}{2}$ years he has had various treatments consisting of support, massage, rest, chiropractic treatments, etc. All of these have helped a little temporarily but the recurrence of his symptoms coincide with the increase in his activities. He states that he has been able to carry on a rather consistent work record only because the company's policy allows him to be on the job without actually doing too many of his former heavy duties or at least allowing him to work to the limits of his abilities consistent with the discomfort in his back.

"His examination findings are not remarkable for any localized source of trouble and his complaints are centered mostly at the approximate L3-4 level. During the past 6 months he states that

there has been radiation of pain from his midlumbar spine region down into the buttocks and into the backs of both thighs.

"This man's diffuse trouble is due to disk degeneration and injury without any actual evidence of prolapse at this time.

"The man is desirous and willing to have special spine studies and surgery, if indicated, to relieve him of his persistent pain and disability. I am sure that discogram studies would show extensive degeneration of the lower lumbar intervertebral disc and would reproduce the pain that he has been having during the past 3½ years.

"I do not believe that surgery to this man's spine will offer him too much since I am sure that extensive disk degeneration is present in several interspaces. I would recommend surgical correction only if he has severe unremitting pain. Therefore, I would not recommend discogram studies at this time purely on the basis of corroborating clinical impression unless surgery was contemplated.

"As I see it, the situation resolves itself to a man who gets along reasonably well with his discomfort if he is not active. Despite the fact that he is willing to have surgery, I would hesitate to consider it since at his age his convalescence would be slow and his chances of being able to carry on with heavy work after surgery would be doubtful.

"Therefore, his salvation at this time rests with a limited activity regime and the avoidance of activities that aggravate his low back and leg radiating pain.

"On the basis of his symptoms and findings and his inability to carry on with sustained activities, he has in my opinion a 50 per cent loss of function of his spine as a permanent partial disability factor."

The record further discloses that, at the request of employee, Dr. Galloway was ordered to appear for cross-examination. He was subjected to a long and rigorous cross-examination. In the end the sum and substance of the testimony of Dr. Galloway as a whole was to the effect that employee was suffering no more than 25 percent permanent disability of the back. During the cross-examination of Dr. Galloway, the neutral physician, employee's attorney asked

him: "Now, do you have a scientific method of determining a permanent partial disability to the back?" The doctor answered: "Not a scientific method, no."

Dr. Evans in both of his reports limited permanent partial disability of the back due to the injury to 25 percent. Dr. Goldner estimated a 50 percent loss of function of the spine as a permanent partial disability. Dr. Goldner differs from the other doctors and is of the belief that the employee's diffuse trouble is due to disc degeneration and injury without any actual evidence of prolapse. Dr. Evans believed that there was an irritative phenomena arising out of a long-standing static and arthritic change. Employee complains that he had no opportunity to make a physical demonstration before the referee. The record does not disclose that any such demonstration was requested.

It is clear from the record that at the conclusion of the testimony the trier of fact had before him the testimony of all 4 of the doctors and their somewhat conflicting views, not only as to the percentage of permanent partial disability to employee's back, but also on structural changes found. Employee contends that, where conflicting medical testimony shows that an employee has either a 25 percent or 50 percent permanent disability of the back, the commission may not, without supporting competent evidence, make a "compromise" finding of 30 percent disability, citing Lappinen v. Union Ore Co. 224 Minn. 395, 29 N. W. (2d) 8, as authority for that contention.[3]

---

[3]Also, see, Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878; Caputa v. Land O' Lakes Creameries, Inc. 234 Minn. 514, 48 N. W. (2d) 895; Kundiger v. Waldorf Paper Products Co. 218 Minn. 168, 15 N. W. (2d) 486; Schwendig v. Anderson & Hedwall Co. 207 Minn. 14, 289 N. W. 772; Westereng v. City of Morris, 205 Minn. 219, 285 N. W. 717; Kruchowski v. Swift & Co. 201 Minn. 557, 277 N. W. 15; Hill v. Umbehocker, 201 Minn. 569, 277 N. W. 9; Wyatt v. Wyett, 200 Minn. 106, 273 N. W. 600; Gardner v. State Dept. of Highways, 199 Minn. 172, 271 N. W. 597; Maher v. Duluth Yellow Cab Co. 172 Minn. 439, 215 N. W. 678; Walker v. Minnesota Steel Co. 167 Minn. 475, 209 N. W. 635; M. S. A. 1949, § 176.11, subd. 5. Cf. Berg v. Sadler, 235 Minn. 214, 50 N. W. (2d) 266; Green v. Schmahl, 202 Minn. 254, 278 N. W. 157.

■ It is well established that parties may stipulate as to what evidence shall be considered by the trier of fact and it was so recognized by this court in the Lappinen case. For the purpose of making clear the limited purpose of the stipulation entered into in that case, the court said (224 Minn. 407, 29 N. W. [2d] 17) :

"A stipulation as to *what evidence* shall be considered by the trier of fact in deciding a particular question excludes the consideration of other evidence. * * * The plain purpose of such a stipulation is to state the evidence without producing it in the ordinary way. Where there is no intention to circumscribe the trier of fact, the common practice is simply to read the stipulated evidence into the record. *But where, in addition, as here, the parties agree that the stipulated evidence is to be used for the purpose of deciding a particular issue of fact, an intention is manifested that the decision shall be based exclusively upon the stipulated evidence.* Otherwise, the stipulated evidence would not be used for such purpose." (Italics supplied.)

The commission in the Lappinen case at no point rejected the stipulation of the parties. A stipulation is binding until set aside. The stipulation was limited to the testimony of the doctors as to nature and extent of disability. The stipulation bound the commission to consider only the evidence which showed a disability of the hand and wrist movement or of the hand and lower forearm. There was no other evidence permitted under the stipulation and none other contained in the record. A certain physical demonstration before the referee was outside of the record, not made a part of it, and not within the stipulation. It could not therefore be considered, and this court held that under the circumstances the commission could not find disability in excess of that for which there was any basis in the evidence which it was entitled to consider. Therefore the commission could not in that case make findings upon the record made before the referee without taking additional evidence since the commission did not see the demonstration.

In the instant case the record is replete with other evidence. It is not limited merely to percentages of disability set forth in the

stipulations, but the reports stipulated upon contain the entire report of each doctor including history given by employee, general physical condition, structural changes, and reasons leading to final conclusions. In addition, there was the full testimony of employee on direct and cross-examination and the cross-examination of the neutral physician appointed by the referee. The Lappinen case, decided upon a stipulation which strictly limited the evidence to be submitted, cannot in any manner be conclusive upon the commission here as the trier of fact.

Neither is the case of Enkel v. Northwest Airlines, Inc. 221 Minn. 532, 22 N. W. (2d) 635, controlling as the relator suggests. In that case relator was 58 years of age, was suffering from a well-advanced condition of arthritis of the back, which was latent but not dormant. At the time of the accident, he was unaware of its existence. Relator suffered a fall causing an injury to the muscles and ligaments of the dorsal lumbar region of the spine. Because of the underlying arthritic condition, the effects of the injury were more severe than they would have been had the spine been normal. The diseased condition of relator's back in that case probably doubled the period of disability which normally could be charged entirely to the injury received in the fall. The evidence disclosed that during the period of healing the arthritic condition continued to develop so that at the time of the hearing relator's disability was due solely to the disease. The physicians disagreed as to the extent of the disability— the relator's physician testifying that it was total; the respondent's physician testifying that it was about 50 percent. The commission allowed compensation on the basis of a temporary total disability which had existed from the date of the accident. In that case the relator had worked steadily up to the time of the accident and was unaware of his back condition. Since the accident and up to the time of the hearing, he had been incapacitated. It is well settled under our decisions that an accident which causes an actual aggravation of an existing injury is compensable. This court held in the Enkel case that it was clearly shown that the arthritic condition was aggravated and accelerated and that relator's incapacity at the

time of the hearing was due to the acceleration and legally attributable to the accidental injury.

In effect this court in that case held that the commission had erred in terminating the compensation payments when it did, both physicians having agreed that the injury accelerated the progress of the disease so as to cause incapacity therefrom at a much earlier date than in the normal course of events and by at least two or three years, as disclosed by the evidence. It was therefore remanded for appropriate findings in conformity with the findings and conclusions of the referee, he having awarded compensation to and including February 14, 1945, the date of the hearing, with the further provision that "payments to continue thereafter as such disability shall warrant, subject to the provisions and limitations of the Minnesota Workmen's Compensation Act."

There is nothing in the Enkel case out of harmony with the decision of the commission here, which is based upon clearly conflicting medical testimony and other competent testimony in the record. In the case of Gurtin v. Overland-Knight Co. 179 Minn. 38, 39, 228 N. W. 169, we announced the rule to be as follows:

"Three physicians, all of whom were competent and straightforward, were the only witnesses. They fixed the impaired ability at 25 per cent. The injured man was before them, and they as witnesses described his injuries and gave their opinions. They could not conclude the commission by their testimony. Whether the physicians have a standard by which they determine the extent of permanent partial disability does not appear; but in any event the statute does not prescribe a rule or method of determining the extent of disability. It is left to the judgment of the trier of fact. The testimony of physicians is useful. They may be helpful in estimating the functional impairment; and a standard of measurement of disability which they adopt, if any, may be useful. But the amount of disability is a question of ultimate fact for the commission. There really is no question of this."

Employee, to further support his contention that the finding of 30 percent permanent partial disability constitutes a percentage of

loss arbitrarily arrived at by a compromise of the conflicting percentage ratings of the doctors, cites the case of Livingston v. St. Paul Hydraulic Hoist Co. 203 Minn. 62, 279 N. W. 829. He argues that a clear analogy to it exists in the case at bar. That case involved permanent partial disability to an employee's eye. The medical factfindings were not in dispute. The question arose as to whether corrected vision could influence or reduce the percentage of actual disability under workmen's compensation. Vision is measured by scientific methods and what is known as the Snellen chart is used by the Industrial Commission as the standard in rating eye losses and the Snellen formula by the medical profession as a test for measuring visual acuity. The decision in the Livingston case was based upon recognized scientific methods. In the instant case the neutral physician Dr. Galloway testified that he did not have a scientific method for determining a permanent partial disability to the back. Clearly the Livingston case is not controlling on the trier of fact where conflicting medical testimony leaves the amount of disability as a question of ultimate fact for the commission's determination.

In Schmoll v. J. W. Craig Co. *supra*, there was a definite conflict in the medical testimony. In that case two outstanding medical experts were of the opinion that the disability was traceable to an injury resulting from an accident occurring in 1942, and the third medical expert was of the opinion that the disability was caused by an accident occurring in 1946. The commission found the 1946 accident to be the cause, and this court held the evidence sufficient to sustain the commission's finding. When it comes to a question of cause and effect, the conclusion must be left to the Industrial Commission where the evidence is conflicting and will sustain a finding either way. Johnson v. Pillsbury Flour Mills Co. 187 Minn. 362, 245 N. W. 619.

A mere preponderance of medical testimony does not prevent a trier of fact from reaching a conclusion to the contrary where such conclusion is sustained by other reasonable testimony. Proof sufficient to sustain the commission's findings need not be of a character necessary to satisfy a medical test. Conway v. Swift &

Co. 175 Minn. 42, 219 N. W. 944. All the testimony in the record must be considered, and when that is done and there is still room for reasonable minds to come to different conclusions, a case is presented where a court of review cannot disturb the findings of the trier of fact. Jones v. Excelsior Laundry Co. *supra.*

In discussing the medical testimony in the Schmoll case, Justice Matson, speaking for the court, said (228 Minn. 432, 37 N. W. [2d] 542) :

"Relators allege, no doubt with truth, that in some cases a finding of fact is based on one theory and in other cases on the opposite theory. They plead for a certain and unchanging rule of thumb whereby all compensability may be measured without variation between individual cases. Obviously, if we were to adopt a standard medical theory for all cases, we would be invading the medical field and riding roughshod over the differences in opinion and theory held by medical experts. Desirable as it may be to find a rule of diagnosis by which the cause of compensable disability may be measured in all cases, it is not for us to prescribe the theory upon which all medical experts must base their testimony."

Employee here had been paid 11-1/5 weeks for temporary total disability, 38-4/5 weeks of temporary partial, and 25 percent permanent partial disability to his back, all amounting to $3,211.08. The referee in his findings increased the extent of permanent partial disability to employee's back to 30 percent.[4] To review this and a finding adverse to further medical treatment, the employee brought certiorari. He contends that referee's finding No. VIII, affirmed by the commission, constituted the crucial finding of fact and that there was legal error inherent in this finding because the commission found and determined upon a percentage disability between 25 percent and 50 percent; that the commission has adopted Dr. Evan's

---

[4]See referee's finding No. VIII which states: "That as a further result of said accidental injury the employe has suffered a 30 per cent permanent partial disability of his back and that any additional disability the employe may have to his back is not by reason of his accidental injury of August 18, 1950, either by way of causation or aggravation."

preconceived medical theory that employee's disability is partly due to the accident and partly due to other causes. Employee's contention is that the commission is not permitted to so find where an injury aggravates a former existing disabling condition.

This court held otherwise in Gile v. Board of Education of Brainerd School Dist. 241 Minn. 88, 62 N. W. (2d) 487, wherein it was held that, where an injured employee over the age of 70 years suffered from high blood pressure; enlargement of the heart; and other infirmities characteristic of old age, the question whether present unemployment was the result of the injury or the infirmities preexisting the injury was a question of fact for determination of the Industrial Commission. It was also held in that case that the mere fact that an employee was awarded the expenses of additional surgery does not of itself compel a finding that during such surgery and the ensuing convalescing period he was by reason thereof entitled to further compensation benefits. This court held that the evidence before it did sustain a finding that he was then disabled due to causes other than the injury and that, even absent any surgery, he would not have been able to work.

So after all the basic question in the instant case to be decided from the evidence as a whole is whether the injury was a cause of loss of earnings due to unemployment, and to what extent, or whether other infirmities, preexisting the injury and of a progressive nature, after a lapse of more than 4 years brought about any part of or all of his injury as it exists today. Those questions are simply fact questions, and it is within the province of the commission upon the whole of the evidence to make those fact decisions and that also applies to referee's finding No. XI, affirmed by the commission, which reads as follows: "That the employee is in need of no further medical care or treatment resulting from his accidental injury of August 18, 1950."

The test of an injured employee's rights to continuing compensation is not the amount he is actually receiving in wages at the determinative moment, but it is rather his ability to earn. Gildea v.

State Dept. of Highways, 208 Minn. 185, 293 N. W. 598; Enrico v. Oliver I. Min. Co. 199 Minn. 190, 271 N. W. 456.

■ The commission's findings as to there being no need of further medical care or treatment due to the accidental injury of August 18, 1950, of course finds support when consideration is given to the whole record. Dr. Evans said in his report of March 5, 1954, that no other active treatment is indicated. All of the doctors were of the opinion that employee's salvation at this time rests with a limited activity regime and the avoidance of activities that aggravate his low-back and leg-radiating pain; that surgery ought not to be considered although he is willing to have it, since it would be doubtful either as a cure or relief. It appears that employee during the years from 1952 to 1954 had obtained relief from chiropractic treatments administered by Dr. Leslie W. Wilke, and this amount was allowed as an expense under medical treatment without objection from employer. These had been continued up to the time of the hearing. The question of future medical care and treatment was not gone into separately and must therefore be based upon the medical reports and the evidence as a whole. The record sustains the finding.

We are again in the realm of fact and should not reverse a finding of the Industrial Commission which has support from the evidence in the record. However, the nature of employee's injury is such that 30 percent of disability was found to be due to the injury. Treatments were recognized up to the time of the hearing and no objection made to including these as a part of the expenses of his medical treatment and care. The later statute enacted in 1953 (L. 1953, c. 755, § 13) to replace M. S. A. 1949, § 176.15, in force when employee was injured, indicates even greater liberality as to medical, surgical, and hospital care and treatments which may reasonably be required at the time of the injury and any time thereafter to cure and relieve from the effects of the injury. Such treatments now include treatments necessary to physical rehabilitation. While the former statute was so construed in Castle v. City of Stillwater, *supra,* it has now been made even more plain that it may be

ordered to relieve from the effects of the injury at any time thereafter even though further medical treatment cannot effect a greater cure. Therefore, this decision, affirming the Industrial Commission's findings on all points, is without prejudice to such application if made, and proven to be injury connected and within the terms of the statute, and the continuing jurisdiction of the commission necessary for its disposition.[5] See, Gildea v. State Dept. of Highways, *supra*.

We have reached the conclusion that the only questions presented and decided by the commission of which employee complains were fact questions and that the burden of proving his case rested upon him. Tillman v. Stanley Iron Works, 222 Minn. 421, 425, 24 N. W. (2d) 903, 905.

Since we are engaged in reviewing a determination of an administrative board, this court will go no further than to determine whether the evidence was such that the board might reasonably make the order or determination which it made. Hamlin v. The Coolerator Co. 227 Minn. 437, 35 N. W. (2d) 616.

It is not our function, as it is that of the commission, to retry the case on appeal. We are concerned only with the question whether there is evidence to sustain the findings of the commission. We conclude that the evidence as a whole sustains the findings. With the indicated qualification regarding future medical care and treatment, the order under review is affirmed.

Affirmed.

---

[5]There is no statute limiting the time when the Industrial Commission may on application grant a rehearing on the propriety of further allowance of medical benefits necessitated or occasioned by the original injury. The legislature has failed to provide a limitation as to the granting of such applications. Johnson v. Iverson, 175 Minn. 319, 221 N. W. 65, 222 N. W. 508; Glassman v. Radtke, 177 Minn. 555, 225 N. W. 889.