Ronald C. HIRSCH, Relator,

v.

BARTLEY–LINDSAY COMPANY,
and Aetna Life & Casualty
Company, Respondents.

Michelle J. SUHSEN, Relator,

v.

CARLSON MARKETING GROUP and Reliance Insurance Company (Administered by Crawford & Company), Respondents.

Charles NELLERMOE, Relator,

v.

INDEPENDENT SCHOOL DISTRICT
# 11, Self–Insured/DCA, Inc.,
Respondent.

Nos. C6–94–871, C1–94–1927
and C0–94–2261.

Supreme Court of Minnesota.

Sept. 8, 1995.

John T. Anderson, Jr., Minneapolis, for Charles Nellermoe.

Charles S. Bierman, Minneapolis, for Bartley–Lindsay.

Nell Elizabeth Mathews, Karen Imus Johnson, Minneapolis, for Carlson Marketing.

Terry J. Battaglia, Minneapolis, for Independent School District No. 11, DCA, Inc.

Louise Dovre Bjorkman, David Schooler, Minneapolis, amicus curiae for MN Defense Lawyers Assoc.

Wilbur W. Fluegel, Minneapolis, Mary E. Kohl, Minneapolis, amicus curiae, for MN Trial Lawyers Assoc.

Gilbert S. Buffington, Attorney General's Office, St. Paul, amicus curiae for Commissioner of Labor & Industry.

Thomas F. Gilde, St. Paul, amicus curiae, for Blue Cross & Blue Shield of Minnesota Comprehensive Management Care.

## OPINION

TOMLJANOVICH, Justice.

The employees in these three cases challenge the validity of durational limitations on medical treatment contained in the Emergency Rules Relating to Workers' Compensation Treatment Parameters.

Ronald Hirsch sustained a compensable low back injury on June 23, 1989, while working for Bartley–Lindsay Company, then insured for workers' compensation liability by Aetna Life & Casualty Company. Hirsch initially sought chiropractic care; but in March 1990, the chiropractor referred Hirsch to an orthopedic surgeon who recommended fusion surgery. Aetna refused to authorize payment for the procedure; the dispute was resolved in August of 1991 by a compensation judge; and Hirsch underwent surgery in October 1991. Hirsch then resumed chiropractic care on an as-needed basis, incurring approximately $1,803.28 in unpaid charges over a two-year period. The compensation judge ordered payment of the charges, find-

Thomas Mottaz, Anoka, Douglas Peine, St. Paul, for Ronald Hirsch.

Thomas D. Mottaz, Anoka, for Michelle J. Suhsen.

ing the treatment was reasonably required to cure or relieve Hirsch from the effects of his injury. Although the employer/insurer had asserted the 12–week limitation on passive care contained in the Emergency Rules Relating to Workers' Compensation Treatment Parameters[1] as a defense to payment for chiropractic care after August 13, 1993, the effective date of the rules, the compensation judge did not expressly address that issue. On appeal, the WCCA reversed and remanded for redetermination, concluding that personnel of the Workers' Compensation Division were required to follow the rules. *Hirsch v. Bartley–Lindsay Company*, Workers' Comp. Dec. (WCCA Filed April 4, 1994).

Michelle J. Suhsen sustained a compensable low back injury on October 13, 1992, while working for Carlson Marketing Group, then insured for workers' compensation liability by Reliance Insurance Company. Because of persistent pain, about a month later she sought chiropractic care. After an initial period of aggressive treatment, the frequency of Suhsen's chiropractic visits decreased until, by the spring of 1993, she was receiving treatment on an as-needed basis. The chiropractor also recommended she engage in an exercise program at a health club, but Reliance Insurance refused to pay for that. Suhsen then bought herself some exercise equipment. In April 1993, Suhsen was evaluated by a neurologist who recommended against a CT or MRI scan so as not to "run up the costs." The neurologist also "strongly" supported the chiropractic care and exercise regimen, particularly where Suhsen has Crohn's disease and should not take medication. In August 1993, Reliance Insurance advised Suhsen that bills for chiropractic care beyond the 12 weeks allowed by the emergency treatment rules would not be honored. The compensation judge ordered payment of $358.68 in unpaid charges, finding the chiropractic care reasonably required, as contemplated by section 176.135 (1992).[2] The compensation judge further determined that the emergency treatment rules "should not and cannot be interpreted so as to abridge the rights or abrogate the obligations of the parties under Minn.Stat. § 176.135 as it existed at the time of the employee's injury." In reliance on *Hirsch*, the WCCA reversed and remanded for reconsideration. *Suhsen v. Carlson Marketing Group*, Workers' Comp. Dec. (WCCA Filed August 16, 1994).

Charles Nellermoe sustained a compensable right upper extremity injury on December 18, 1992, while employed by Independent School District No. 11. Nellermoe was ultimately referred to an orthopedic surgeon who recommended surgery for lateral epicondylitis after "aggressive conservative medical care" had failed. Prior to surgery, Nellermoe was evaluated by an orthopedic consultant chosen by the claims examiner for the self-insured/DCA. The consultant said that he "personally would not operate on [Nellermoe's] right elbow if he were the treating physician" although it was "possible that a surgical procedure at his elbow could give him some symptomatic improvement." Nellermoe underwent "same day surgery" and following recovery, he obtained work with Apollo Precision in Minnetonka. The self-insured/DCA, Inc. refused to pay the medical

1. The emergency treatment parameter at issue here provides: "[t]he use of passive treatment modalities in a clinical setting * * * is not indicated beyond 12 calendar weeks after the first passive modality is initiated." Minn. R. [Emergency] 5221.6200, subp. 3.

2. Minn.Stat. § 176.135, subd 1(a) (1994), which is basically the same provision in effect at the time of injury in all three cases, provides in relevant part:

The employer shall furnish any medical, psychological, chiropractic, podiatric, surgical and hospital treatment, including nursing, medicines, medical, chiropractic, podiatric, and surgical supplies, crutches and apparatus, including artificial members, or, at the option of the employee, if the employer has not filed notice as hereinafter provided, Christian Science treatment in lieu of medical treatment, chiropractic medicine and medical supplies, as may reasonably be required at the time of the injury and any time thereafter to cure and relieve from the effects of the injury. This treatment shall include treatments necessary to physical rehabilitation.

This court long ago construed the phrase "cure and relieve" to mean "cure or relieve," and held that palliative measures are compensable even if there is no hope of a cure. *Castle v. City of Stillwater*, 235 Minn. 502, 51 N.W.2d 370 (1952); *Eberle v. Miller*, 170 Minn. 207, 212 N.W. 190 (1927).

bills contending, among other things, the surgery was not in compliance with the requirement that 12 months of initial nonsurgical management precede surgery. Minn. Rule 5221.6300 [Emergency], subp. 11B.[3] In response to an inquiry from Nellermoe's attorney, Nellermoe's surgeon said the surgery was reasonably required in that conservative care had been exhausted, "and this was verified by the extremely thin tissue we found at the time of surgery." The doctor also said "it would have done us no additional good to simply keep [Nellermoe] off work from August through December[,] until the 12 months had passed. In the interest of returning him to work as quickly as possible, surgery was indicated when conservative treatment had been exhausted." The compensation judge found the surgery reasonably required and "in substantial compliance" with the rules; but the WCCA reversed, concluding Minn. Rule 5221.6300 [Emergency], subp. 11B required 12 months of initial nonsurgical management prior to reevaluation for surgical therapy. *Nellermoe v. Independent School District No. 11,* Workers' Comp. Dec. (WCCA Filed October 11, 1994).

In 1991, the Department of Labor and Industry published an action plan for implementing recommendations for controlling medical costs in the workers' compensation system. The solution to the problem lay, according to the plan, in controlling the utilization of services as well as price per service. Consequently, as part of a comprehensive package to control and contain medical costs, the Minnesota legislature adopted a uniform billing form for health care providers, replaced the medical fee schedule with a relative value based schedule and developed a managed care plan option for employers.[4]

The legislature also amended the medical services rules provision, Minn.Stat. § 176.83, subd. 5, granting the Commissioner of Labor and Industry authority to adopt "emergency and permanent rules establishing standards and procedures for health care provider treatment" for purposes of determining "whether a provider of health care services * * * is performing procedures or providing services at a level or with a frequency that is excessive, unnecessary, or inappropriate based upon accepted medical standards for quality health care and accepted rehabilitation standards." Act of April 28, 1992, ch. 510, art. 4, § 21, 1992 Minn. Laws 640–41. In response, the Commissioner of Labor and Industry promulgated the Emergency Rules Relating to Workers' Compensation Treatment Parameters, effective May 18, 1993.

The rules provide that all treatment given after the effective date must conform to the rules. Minn. R. 5221.6020 [Emergency], subp. 2. A departure from an applicable rule is allowable if there is "a documented medical complication; documented continuing [progressive improvement from] initial nonsurgical treatment: * * * unusual medical circumstances related to the employee's return to work; or mismanagement of prior treatment by a health care provider." Minn. R. 5221.6050 [Emergency], subp. 8C(3). In resolving a dispute over payment for medical care, a compensation judge is limited to ascertaining whether a treatment rule applies, whether the treatment provided or proposed to be provided is consistent with the rule, and whether a departure from the rule is allowed because of one of the four reasons specified in the list of departure reasons. Minn. R. 5221.6050 [Emergency], subp.

---

**3.** Minn. R. 5221.6050 [Emergency], subp. 4, provides that "[h]ealth care providers shall provide a trial of nonoperative treatment before offering or performing surgical treatment unless the treatment for the condition requires immediate surgery or unless an emergency or life threatening situation exists." Minn. R. 5221.6040 [Emergency], subp. 9 provides that "[t]he period of initial nonsurgical treatment ends when reevaluation is required to determine whether surgery or chronic management is indicated * * *." Minn. R. 5221.6300 [Emergency], subp. 11.A. and B. provides that "[i]nitial nonsurgical management is appropriate for all patients with epicondylitis and must be the first phase of treat-

ment" and subpart B of that rule says "[i]f the patient continues with symptoms and objective physical findings after 12 months of nonsurgical management, and if the patient's condition prevents the resumption of regular activities of daily life including regular vocational activities, then the patient's condition should be reevaluated and surgical therapy provided, if indicated."

**4.** Department of Labor and Industry Statement of Need and Reasonableness in Support of Proposed Permanent Rules Relating to Workers' Compensation Treatment Parameters, June 1994.

8C(1), (2), (3), (4). If medical care is not in compliance with the rules, the health care provider may not seek payment from any source, Minn.Stat. § 176.83, subd. 5; and if a health care provider is not in compliance with a treatment rule in the care of three or more employees, the Commissioner will order sanctions, including a fine of up to $200 per violation. Minn. R. 5221.8900 [Emergency], subp. 7.

There are general rules for medical imaging, Minn. R. 5221.6100 [Emergency], hospitalization, Minn. R. 5221.6400 [Emergency], and surgery, Minn. R. 5221.6500 [Emergency]; and there are specific rules for the diagnosis and treatment for low back pain and upper extremity disorders, Minn. R. 5221.6200, 5221.6300 [Emergency]. For example, the rules say that before initiation of treatment for low back pain, the physician or health care provider "must assign the patient" to one of four "clinical" categories: (1) regional low back pain, including referred pain to the leg above the knee; (2) radicular pain with or without regional low back pain, with static neurological deficit; (3) radicular pain with or without regional low back pain with foot drop or progressive neurologic deficit; and (4) cauda equina syndrome. Minn. R. 5221.6200, subp. 1. The rules then divide treatment of low back pain into three general phases: initial nonsurgical care, reevaluation of diagnosis and surgery if indicated, and chronic management for employees who are not candidates for, or who refuse, surgery. Minn. R. 5221.6200, subp. 2 B.

Initial nonsurgical care for low back pain includes passive treatment modalities (e.g. chiropractic manipulation, therapeutic massage, thermal treatment, ultrasound) and active treatment modalities (e.g. education, posture and work method training, work-site analysis and modification, and exercise). Minn. R. 5221.6200, subp. 2B(1) [Emergency], subp. 3 and subp. 4. Passive treatment modalities in a clinical setting cannot exceed 12 calendar weeks after the first passive modality was initiated. Minn. R. 5221.6200 [Emergency], subp. 3.

Surgery for low back pain may only be performed if it is in compliance with the rule that applies to the appropriate diagnostic category. Prior authorization from the insurer is required, and post-operative therapy is limited to eight weeks. Repeat surgery is not allowed without a second opinion obtained prior to surgery if requested by the insurer. Minn. R. 5221.6050 [Emergency], subp. 9; 5221.6200 [Emergency], subp. 6.

The low back pain rules go on to say that the physician or health care provider "must at each visit evaluate whether the treatment has been effective as defined in part 5221.6040 [Emergency], subp. 5." Minn. R. 5221.6200 [Emergency], subp. 9A. If the treatment modality has not been effective, the modality "must be discontinued or significantly modified or the provider must reconsider the diagnosis." *Id.* If at any time the initial nonsurgical plan ceases to be effective, "the provider must discontinue or significantly modify the treatment, reconsider the diagnosis, or the patient must be referred for consultation," Minn. R. 5221.6200 [Emergency], subp. 9B, and there is a rule to govern referrals. Minn. R. 5221.6050 [Emergency], subp. 6.

There are rules for exacerbations of low back pain. If the employee had made a "full recovery" and had been "symptom-free," a full cycle of passive care is allowed for a recurrence or exacerbation of symptoms. Minn. R. 5221.6200 [Emergency], subp. 10A. If an employee who has not made a full recovery develops new symptoms, the physician "must reassess the clinical category, using any indicated diagnostic procedures within the parameters of subpart 1." Minn. R. 5221.6200 [Emergency], subp. 10B(1). If there is a change in clinical category, a full cycle of passive care is allowed. *Id.* If the clinical category is not changed, passive care is limited to one month for the exacerbation; and if the problem has not resolved at that point, or if this is the second exacerbation within 12 months, the employee "shall be evaluated for surgery, or chronic management under subpart 7." Minn. R. 5221.6200 [Emergency], subp. 10(B)(2).

The low back pain rules then specify the "phase" and duration of treatment for the four clinical low back pain categories. Minn. Rule 5221.6200 [Emergency], subp. 11A says that initial nonsurgical treatment "must be

the initial phase of treatment for all patients with regional low back pain under subpart 1, item A, subitem (1)." After the first week of treatment, initial nonsurgical care "must at all times contain active treatment modalities according to the treatment parameters of subpart 4" and a health care provider may not furnish passive treatment beyond 12 weeks. Minn. Rule 5221.6200 [Emergency], subp. 11A(2) and (4). Re-evaluation for surgery "may begin as soon as eight weeks after, but must begin no later than 12 weeks after, beginning initial nonsurgical care." Minn. Rule 5221.6200 [Emergency], subp. 11B. "The only surgical procedure" allowable for employees with regional low back pain is "lumbar arthrodesis, with or without instrumentation, which must meet the parameters of part 5221.6500 [Emergency], subpart 2, item C." Minn. Rule 5221.6200 [Emergency], subp. 11B(6). If surgery is not indicated, or the employee does not wish to proceed with surgery, chronic management rules govern additional medical care, and no further passive care is allowed. Minn. Rule 5221.6200 [Emergency], subp. 11 B(6)(b). There are similar rules for the other three clinical categories of low back pain, Minn. R. 5221.6200 [Emergency], subp. 12, 13 and 14. Insurer authorization is required before initiating treatment that departs from the rules, and the rules set out what is supposed to happen when the insurer denies authorization. Minn. R. 5221.6050 [Emergency], subps. 8.

There are similar rules for the treatment of upper extremity disorders, including requirements for the assignment of patients to one of four clinical categories, passive and active treatment modalities, surgery, chronic management modalities, and durable medical equipment, Minn. R. 5221.6300, subps. 1A, 3, 4, 6, 7; and there are specific rules for treatment of the four clinical categories of upper extremity disorders, including that surgery for epicondylitis may be considered

if "the patient continues with symptoms and objective physical findings after 12 months of initial nonsurgical management * * *." Minn. R. 5221.6300, subp. 11B.

■ Hirsch and Suhsen contend that emergency rule 5221.6020, subp. 2 (requiring application of the rules to all treatment after the rules' effective date), acting in tandem with the exclusive list of departure reasons, Minn. R. 5221.6050 [Emergency], subp. 8C, and the 12-week limitation on passive care, Minn. R. 5221.6200 [Emergency], subp. 3, exceed the authority delegated to the Commissioner by the enabling legislation, conflict with other legislation, and infringe on the decisional independence of compensation judges. They also challenge the constitutionality of the rules. Nellermoe contends that his medical treatment was in substantial compliance with the rules, or if it was not, Minn. R. 5221.6300, subp. 11B conflicts with section 176.135. Bartley–Lindsay/AETNA and Carlson Marketing Group/Reliance contend that the rules do not alter the basic right to reasonably required medical care, but merely define what treatment is reasonable, and they maintain that the legislature required the Commissioner to regulate the delivery of medical care.[5]

■ An agency has the power to issue binding administrative rules only if, and to the extent, the legislature has authorized it to do so. "The legislature states what the agency is to do and how it is to do it. While express statutory authority need not be given a cramped reading, any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature." *Peoples Natural Gas Co. v. Minnesota P.U.C.*, 369 N.W.2d 530, 534 (Minn.1985). Here, the enabling legislation granted the Commissioner power to "adopt emergency and permanent rules establishing

---

**5.** The Commissioner, who appears as an amicus in *Hirsch*, suggests that an attack on the validity of the rules in that case may only be made in a declaratory judgment action pursuant to Minn. Stat. § 14.44–45. However, where Bartley–Lindsay/Aetna are seeking enforcement of the rules in the compensation proceeding, the employee may properly resist enforcement on the

ground of invalidity of the rule. *State by Spannaus v. Lloyd A. Fry Roofing Co.,* 310 Minn. 528, 246 N.W.2d 696 (1976). Furthermore, as a general matter, a declaratory judgment action supplements, but does not supplant other remedies. *Land O'Lakes Dairy Co. v. Sebeka Village,* 225 Minn. 540, 31 N.W.2d 660, *cert. denied,* 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948).

standards and procedures for health care provider treatment. * * *. The rules shall be used to determine whether a provider of health care services * * * is performing procedures or providing services at a level or with a frequency that is excessive, unnecessary, or inappropriate based upon accepted medical standards for quality health care * * *." Minn.Stat. § 176.83, subd. 5. The enabling legislation further says that "if it is determined by the payer that the level, frequency or cost of a procedure or service is excessive, unnecessary, or inappropriate according to standards established by the rules, the provider shall not be paid * * * unless the commissioner or compensation judge determines at a hearing or administrative conference that the level, frequency, or cost was not excessive in which case the insurer, self-insurer, or group self-insurer shall make the payment deemed reasonable." *Id.* Thus, the unambiguous language of the enabling legislation empowers the Commissioner to establish "standards" to be used to decide whether a provider is furnishing medical care that is "excessive, unnecessary, or inappropriate." The question then is whether the legislature intended, without saying so, to authorize the Commissioner to regulate the delivery of medical care through such means as durational limits on medical services and the exclusive list of departure reasons.

The basic medical benefits provision, Minn. Stat. § 176.135, subd. 1, says that medical care is provided "at the time of injury and any time thereafter" and it has long been recognized as placing no limitation on the duration of medical care. *Casey v. Northern States Power Co.*, 247 Minn. 295, 77 N.W.2d 67 (1956); *see also Fehland v. City of St. Paul*, 215 Minn. 94, 9 N.W.2d 349 (1943) (predecessor provision). It is therefore of some significance that the legislature did not amend this phrase in Minn.Stat. § 176.135, subd. 1, although it could have done so, and in fact did amend the provision to add a service to the list of compensable medical care, as it has on numerous occasions in the past. Act of April 28, 1992, ch. 510, art 4, § 9, 1992 Minn. Laws 633 (adding nursing services); *see, e.g.,* Act of June 8, 1971, ch. 863, § 1, 1971 Minn. Laws 1712–13 (adding chiropractic care); Act of June 3, 1989, ch.

335, art. 1, § 180, 1989 Minn. Laws 2853 (adding psychological care).

The Commissioner, appearing as an amicus in *Hirsch,* explains that durational limits on medical services are essential to accomplishing the legislative goal of cost-containment. However, "a rule adopted in pursuit of legislative goals cannot subvert the primary purpose behind the legislation." *Weber v. City of Inver Grove Heights,* 461 N.W.2d 918, 922 (Minn.1990). While "administrative agencies may adopt regulations to implement or make specific the language of a statute, they cannot adopt a conflicting rule." *Green v. Whirlpool Corp.,* 389 N.W.2d 504, 506 (Minn.1986). Accordingly, to the extent durational limitations on medical care set out by the rules conflict with Minn.Stat. § 176.135, subd. 1, the statute prevails. Moreover, the purpose of providing medical care is to return the employee, as nearly as possible, to his or her pre-injury state of wellness, *Langa v. Fleischmann–Kurth Malting Co.,* 481 N.W.2d 35, 37 (Minn.1992), and the Act provides the only practical means by which an injured worker can obtain necessary medical treatment for a work-related injury. While certainly durational limitations on medical care facilitate cost-containment, to deny payment for reasonably priced medical care that works, simply because of a time line, subverts the primary purpose of the medical benefits provision.

As to questions of necessity for treatment, Minn.Stat. § 176.135, subd. 1(e) places that matter in the discretionary power of the compensation judge. As the WCCA observed, the exclusive list of reasons for departing from the emergency rules infringes on that discretion. The Commissioner explains that the exclusive list of departure reasons is necessary to enforce the rules; but as we said in *Peoples Natural Gas,* "[i]t is not enough that the * * * [rule] would be useful * * * as an enforcement measure. * * * The [agency] remains a creature of statute." 369 N.W.2d at 535. The workers' compensation adjudication system is based to a significant extent on the judicial model of decisionmaking. The compensation judge serves as factfinder and decisionmaker.

Minn.Stat. § 176.371. The compensation judge must develop all of the evidence, including that contrary to the claimant's position, through hearings and investigations; and the compensation judge must issue a decision based upon relevant evidence. Minn.Stat. § 176.411. While compensation judges are not "constitutionally protected," they do have a certain degree of independence from the agency in which they adjudicate disputes as they are the people who have been charged with the responsibility of ascertaining the substantial rights of the parties in a fair and objective manner. Minn. Stat. § 14.48. We see nothing in the enabling legislation suggesting an intent to in any way tamper with this system. To the contrary, while under section 176.83, subd. 5 the insurer may deny payment of the costs incurred in connection with treatment that is not in compliance with the rules, the ultimate determination as to whether medical services are excessive, unnecessary or inappropriate remains with the compensation judge following a hearing. We also think it highly unlikely the legislature intended to exclude from a compensation judge's consideration new research and study indicating that certain popular and expensive procedures allowed by rule no longer have solid scientific support.

We also think it important that the legislature asked for "standards" and "criteria" for judging the propriety of medical care, not regulations on the delivery of that care. With standards and criteria, one has a basis of comparison for judging the value of something; but with regulations comes the connotation of control. With standards comes flexibility and the recognition that a certain amount of medical judgment is necessary in providing adequate and reasonable medical care under a given set of circumstances, and that a certain amount of judicial discretion is likewise required in deciding whether that care is compensable.[6] It seems to us that to the extent the exclusive list of departure reasons (Minn. Rule 5221.6050 [Emergency], subp. 8C) unduly infringes on that discretion, the rule exceeds the authority granted by the legislature.

That is not to say that provisions similar to the emergency rules could have no place in determining questions concerning the necessity for treatment. If the rules could be used as standards, and not as binding regulations, employees, employers, insurers and providers would have guidance as to what treatment is compensable without dispute. If the rules could be used as standards, and not as binding regulations, compensation judges would have a model from which to judge the propriety of medical treatment that has been provided, yet retain the flexibility to perform their judicial function based upon the evidence before them in an individual case.

The rules as set forth, however, purport to be binding regulations. Because Minn. R. [Emergency] 5221.6200, subp. 3 and Minn. R. [Emergency] 5221.6200, subp. 8C are inconsistent with Minn.Stat. § 176.135 and exceed the legislative authorization, they are invalid. We therefore reverse the decisions of the WCCA remanding *Hirsch* and *Suhsen* for redetermination pursuant to these rules. We also reverse the decision of the WCCA in *Nellermoe* on grounds that Minn. R. [Emergency] 5221.6300, subp. 11B is inconsistent with section 176.135 and therefore invalid. Because of the disposition herein, we do not reach questions concerning the constitutionality of the emergency treatment rules.

Reversed.

Hirsch is allowed $800 in attorney fees.

Suhsen is allowed $400 in attorney fees.

Nellermoe is allowed $400 in attorney fees.[7]

---

6. In Massachusetts, legislation directing the promulgation of "regulations" for the provision of medical care also provided that the regulations were to be presumptive of compensable care: "Any provision of health care services in material compliance with such regulations shall be presumed to be adequate and reasonable. Any material departure from said regulations shall be presumed an inadequate or unreasonable provision of health care services." Mass. Laws, Ch 152, § 30 (1994).

7. Briefing in *Hirsch* was completed and the matter scheduled for oral argument long before briefing in *Suhsen* and *Nellermoe* could have been completed. Rather than delay resolution of the dispositive issue, the latter two cases were

STRINGER, J., took no part in the consideration or decision of this case.

GARDEBRING and ANDERSON, JJ., concur in the result of the case.

considered on a nonoral basis, and the award of attorney fees reflects this.