Jeffrey KLINE, Relator,

v.

BERG DRYWALL, INC., and American Compensation Insurance Co./RTW, Inc., Respondents.

No. A03–420.

Supreme Court of Minnesota.

Aug. 5, 2004.

Wilbur W. Fluegel, Fluegel Law Office, Minneapolis, MN, Russell G. Sundquist, St. Paul, MN, for Relator.

Janet Monson, Kelly M. Brewbaker, Aafedt, Forde, Gray & Monson, Minneapolis, MN, for Respondent.

William K. Ecklund, Karen M. Charlson, Felhaber, Larson, Fenlon & Vogt, P.A., St. Paul, MN, Amicus Curiae for Union Construction Craft Workers' Compensation Fund.

## OPINION

PAGE, Justice.

This workers' compensation matter comes before this court by certiorari upon the relation of Jeffrey Kline. Kline seeks review of a decision of the Workers' Compensation Court of Appeals (WCCA) re-

versing an arbitrator's denial of benefits and remanding for reconsideration. Concluding that Kline is entitled to a new arbitration, we affirm as modified.

On May 8, 2001, Jeffrey Kline sustained a work-related injury to his right lower abdomen while employed as a carpenter for Berg Drywall, Inc. The injury occurred as Kline was lifting a piece of sheetrock that buckled.

On May 17, 2001, Kline sought medical treatment at Park Nicollet Medical Center (PNMC), complaining of right groin pain and pain in the lower quadrant. Dr. Thomas Lohstreter diagnosed a right inguinal hernia or internal ring strain and allowed Kline to return to work with a 20-pound lifting restriction. Dr. Kevin Ose at PNMC examined Kline on May 24 and May 31, 2001, and diagnosed a right groin strain with no evidence of an inguinal hernia. Dr. Ose advised Kline to avoid lifting and strenuous activity. On June 4, 2001, Dr. Robert Gorman at PNMC examined Kline and also diagnosed a right groin strain. Dr. Gorman extended the lifting restrictions and ordered an ultrasound, which showed a normal abdominal wall with no evidence of a hernia. At a follow-up visit with Dr. Gorman on July 3, 2001, the doctor diagnosed a right groin strain and a right adductor thigh strain. On August 15, 2001, Kline returned to Dr. Gorman for further follow-up on his right groin and thigh complaints. During this visit, Kline stated that over the last few weeks he had felt more depressed, lacked interest in usual activities, lacked concentration, and struggled with feelings of guilt and worthlessness. Dr. Gorman diagnosed a chronic right groin strain and right adductor thigh strain and prescribed Paxil for depression. Dr. Gorman recommended an MRI scan and continued restrictions of 20 to 40 pounds of lifting, with limited bending, twisting, and sitting, and the ability to change positions as needed. An MRI scan of Kline's right hip on August 22, 2001, was normal.

On September 18, 2001, Kline saw Dr. Ali Ahmad Hamidi at PNMC with continued complaints of groin pain. Dr. Hamidi found no swelling, but noted severe tenderness over the medial aspect of the inguinal area and tenderness in the groin, testicle, and cords. Dr. Hamidi diagnosed right groin and testicle pain due to the work injury. On October 16, 2001, Kline returned to see Dr. Gorman. The doctor's diagnosis was unchanged and he continued the same restrictions. Dr. Gorman increased Kline's daily Paxil dosage and suggested that Kline contact the mental health department for further evaluation and treatment. At a follow-up visit on November 15, 2001, Dr. Gorman concluded that Kline had reached maximum medical improvement and found no permanent partial disability. However, Dr. Gorman continued lifting restrictions and, in a March 6, 2002, report, Dr. Gorman concluded the May 8, 2001, accident caused a permanent injury to Kline's right lower quadrant. In the same report, Dr. Gorman indicated the work-related injury aggravated Kline's depression.

Berg Drywall and its workers' compensation liability insurer, American Compensation Insurance Co./RTW, accepted liability for the injury. Subsequently, a dispute arose over the nature, extent, and duration of Kline's injury and disability. Pursuant to the collective bargaining agreement between Kline's union and Berg Drywall, work-related-injury disputes were to be resolved through an alternative dispute resolution system permitted under Minn. Stat. § 176.1812 (2002). Under the terms of the agreement, work-related-injury disputes are addressed through the Rules and Regulations of the Union Construction Crafts Workers' Compensation Fund

(Fund). The Fund is not an insurance provider or program, but a claim dispute administration service. The Fund is made up of a 12–person board consisting of six members chosen by labor and six members chosen by management. Kevin Gregerson is the administrator and dispute resolution facilitator of the Fund. The rules of the Fund provide for a three-step process for resolving disputes: facilitation, mediation, and arbitration. Fund R. 3.1 (2001).

In September 2001, at the request of the employer and insurer, Gregerson scheduled a dispute resolution examination with Dr. Mark H. Johnson.[1] Gregerson furnished the doctor with Kline's medical records, a "work comp summary" prepared by the employer's office manager, and a copy of the surveillance reports. Kline was examined by Dr. Johnson on November 6, 2001. Dr. Johnson found no medical evidence to indicate that Kline had sustained any significant work injury. He believed that, while Kline may have sustained a strain in the right inguinal area that may have taken several weeks to resolve, there was no indication of any significant damage. The doctor also believed there was symptom magnification and, perhaps, malingering, and noted a great disparity between Kline's reports of what he was able to do "and the actual observation of his physical activities." Dr. Johnson said Kline was not in need of any restrictions for his work injury and that he suffered no permanent partial disability. On November 26, 2001, the employer terminated Kline's employment.[2]

Kline retained attorney Russell G. Sundquist to represent him at a facili-

tation scheduled for December 18, 2001. By letter faxed and mailed on December 17, 2001, Sundquist was provided with a copy of the Fund's rules and regulations that provide that "counsel shall not be present during the facilitation unless all parties agree." *Id.* at R. 3.4. Kline attended the facilitation without legal counsel. Kathy Berg, manager/owner of Berg Drywall, Kris Mitlestaedt, Berg Drywall office manager, and Mary Dennis, American Compensation Insurance Co./RTW claims representative, attended the facilitation on behalf of the employer and insurer. The facilitator's decision, terminating the employee's benefits, was apparently rendered on December 26, 2001. The parties proceeded to mediation; and when that proved unsuccessful, Kline filed an application for arbitration.

While the arbitration was pending, Gregerson scheduled a dispute resolution examination with Dr. Stephen Butzer, a psychiatrist, who examined Kline on May 22, 2002. Gregerson furnished Dr. Butzer with medical records, letters, comments from both parties, and a list of questions for the doctor's response. Dr. Butzer concluded that Kline was malingering and that any mental health problems were unrelated to the work injury.

The arbitration hearing took place on June 24, 2002, before arbitrator Jeffrey W. Jacobs, who affirmed the discontinuance of benefits. Concluding that a dispute resolution examination was to be given greater weight than a traditional independent medical examination under the Fund's arbitration rules, the arbitrator found that Kline's work injury was temporary in na-

---

1. The Rules and Regulations of the Union Construction Crafts Workers' Compensation Fund established a list of health-care providers to provide "peer review, chart reviews, second opinion exams, or dispute resolution exams." Fund R. 9.1.

2. Following his injury, Kline returned to work for Berg Drywall in a light-duty capacity. Based on the report of Dr. Johnson authorizing a return to work without restrictions, Berg Drywall "dissolved" the light-duty position.

ture and had resolved no later than November 21, 2001. The arbitrator also concluded that Kline had not established a psychological injury. Kline appealed to the WCCA, asserting that: (1) the Fund's alternative dispute resolution (ADR) system, by prohibiting legal representation in the early stages of the process, was unconstitutional and also void under Minn.Stat. § 176.1812, subd. 4 (2002); (2) there was an inherent conflict of interest in the arbitration; (3) the arbitrator misconstrued the arbitration rules in giving greater weight to the dispute resolution examination; and (4) the neutral physician process was inherently flawed.

The WCCA rejected Kline's challenges to the ADR system and declined to rule on the constitutional claim, noting that it was not empowered to resolve constitutional issues. *Kline v. Berg Drywall, Inc.*, 2003 WL 1917004, at *4 (Minn. WCCA Mar. 31, 2003) (citing Minn.Stat. § 175A.01, subd. 5 (2002)). The WCCA, however, agreed that the arbitrator misconstrued the Fund's rules in giving greater weight to the dispute resolution examination reports and remanded the matter for reconsideration. *Id.* at *7. In seeking our review, Kline reasserts his challenges to the validity of the ADR process based on the exclusion of legal counsel in the early stages of the process and also on an inherent conflict of interest. The employer and insurer and the Fund, appearing as amicus curiae, assert that this court does not have jurisdiction to hear, consider, and decide the matter.

## I.

"The workers' compensation system in Minnesota is based on a mutual renunciation of common law rights and defenses by employers and employees alike." Minn. Stat. § 176.001 (2002). "[A]n injured employee is guaranteed compensation from his or her employer for work-related injuries regardless of the employee's fault or the employer's lack of fault, in exchange for forfeiting the right to sue the employer in tort." *Minnesota Brewing Co. v. Egan & Sons Co.*, 574 N.W.2d 54, 58 (Minn.1998) (citing *Lambertson v. Cincinnati Welding Corp.*, 312 Minn. 114, 120–21, 257 N.W.2d 679, 684 (1977)). In most other circumstances, the employee retains his or her common law right to recover in tort from a negligent third party. *Id.* "Strictly speaking, the rights and liabilities created by the Workers' Compensation Act are imposed on the employment relationship pursuant to the police power, independently of any actual or implied contract." *Joyce v. Lewis Bolt & Nut Co.*, 412 N.W.2d 304, 307 (Minn.1987) (citing *Todeva v. Oliver Iron Mining Co.*, 232 Minn. 422, 428, 45 N.W.2d 782, 788 (1951)).

The act originally provided that settlements for workers' compensation claims were to be in substantial accord with the statutory compensation schedule and provisions for distribution and had to be approved by a judge of the district court. Act of Apr. 24, 1913, ch. 467, § 22, 1913 Minn. Laws 685 (codified at Minn.Stat. § 8216(1) (1913)). In the case of a dispute or a failure to agree upon a claim for compensation, either party could submit the claim to a judge of the district court who was to hear and summarily determine the dispute. *Id.* at 686 (codified at Minn. Stat. § 8216(2) (1913)). The judge's decision was conclusive and binding, subject to a right of appeal to this court. *Id.* at 688–89 (codified at Minn.Stat. § 8225 (1913)).

"It soon became apparent that despite the stated amounts of compensation payable for permanent partial disability resulting from any of an array of specified disabilities, the parties were often in serious disagreement." *Meath v. Harmful Substance Comp. Bd.*, 550 N.W.2d 275, 278

(Minn.1996). Consequently, in 1921 the act was amended to transfer adjudication of compensation claims to the Industrial Commission in the Department of Labor and Industry. Act of Mar. 14, 1921, ch. 81, § 2, 1921 Minn. Laws 86 (codified at Minn. Stat. § 4033 (1923)); Act of Mar. 15, 1921, ch. 82, § 42, 1921 Minn. Laws 116–17 (codified at Minn.Stat. § 4302 (1923)). The legislation provided for a hearing and decision with respect to eligibility for compensation, medical expenses, and the extent of injury and disability before a referee of the Industrial Commission with a right of appeal to the Industrial Commission. Act of Mar. 15, 1921, ch. 82, §§ 42, 43, 50, 1921 Minn. Laws 116–17, 119 (codified at Minn. Stat. §§ 4302, 4303, 4310 (1923)). For error of law or on the ground that the findings of fact were unwarranted by the evidence, review by certiorari could be had in this court. Act of Mar. 15, 1921, ch. 82, § 60, 1921 Minn. Laws 122–23, amended by Act of Apr. 21, 1921, ch. 423, § 2, 1921 Minn. Laws 652–53 (codified at Minn.Stat. § 4320 (1923)). In *Breimhorst v. Beckman*, we held that the vesting of quasi-judicial powers in the Industrial Commission, including the power to determine facts and apply the law in workers' compensation disputes, did not violate the separation of powers under the Minnesota Constitution as long as the commission's awards and determinations are subject to review by this court on certiorari. 227 Minn. 409, 433, 35 N.W.2d 719, 734 (1949).

"The workers' compensation adjudication system [has been] based to a significant extent on the judicial model of decisionmaking." *Hirsch v. Bartley–Lindsay Co.*, 537 N.W.2d 480, 486 (Minn.1995). Currently, a compensation judge at the Office of Administrative Hearings serves as factfinder and decisionmaker. Minn. Stat. § 176.371 (2002). The compensation judge develops all of the evidence, including that contrary to the claimant's position, through hearings and investigations, and the compensation judge issues a decision based upon relevant evidence. Minn.Stat. § 176.411 (2002). "While compensation judges are not 'constitutionally protected,' they do have a certain degree of independence from the agency in which they adjudicate disputes as they are the people who have been charged with the responsibility of ascertaining the substantial rights of the parties in a fair and objective manner." *Hirsch*, 537 N.W.2d at 487. Decisions of the compensation judge are appealable to the WCCA, an independent agency in the executive branch. Minn.Stat. §§ 175A.01, subd. 1, 176.421, subd. 1 (2002). Decisions of the WCCA are subject to review by this court on certiorari. Minn.Stat. § 176.471, subd. 1 (2002).

"A new and popular reform in the workers' compensation movement are laws allowing employers and unions to opt out of the state-run adjudicatory system and collectively bargain workers' compensation." Ellyn Moscowitz & Victor J. Van Bourg, *Carve–Outs and the Privatization of Workers' Compensation in Collective Bargaining Agreements*, 46 Syracuse L.Rev. 1, 18 (1995). Legislation allowing the privatization of workers' compensation commonly contains an ADR system, "which in most contracts includes a three stage process involving an ombudsman, mediation and arbitration." *Id.* at 3–4. Another "common characteristic of the contracts" is the denial of legal representation "until an ombudsman and a mediator have had an opportunity to resolve the dispute in question."[3] *Id.* at 4.

**3.** In the "limited" number of contracts in existence in early 1995, "few 'disputes'" went beyond the initial ombudsman stage, an indication of either how well the program was "working in avoiding disputes, or a sign of how the program [was] failing uninformed

In Minnesota, the Chamber of Commerce and the AFL–CIO lobbied the legislature for the inclusion of workers' compensation in a collective bargaining agreement. Linda J. Starr, Note, *Injured on the Job: Using Alternative Dispute Resolution to Improve Workers' Compensation in Minnesota*, 18 Hamline J. Pub.L. & Pol'y 487, 513–14 (1997).[4] In 1995, the legislature adopted legislation allowing employers and unions to include in collective bargaining agreements a workers' compensation ADR system. Act of May 25, 1995, ch. 231, art. 2, § 71, 1995 Minn. Laws 2052–53 (codified at Minn.Stat. § 176.1812, subd. 1 (2002)).[5] All agreements must meet filing and data-reporting requirements. *Id.* at 2054

injured workers." Moscowitz & Van Bourg, *supra* at 4.

4. The Chamber of Commerce lobbied for opt-out legislation on behalf of contractors, and the unions "may have felt this was a good way to keep the cost of hiring union labor competitive with non-union workers." Starr, *supra* at 514.

5. Minnesota Statutes § 176.1812, subdivision 1, provides:

Upon appropriate filing, the commissioner, compensation judge, workers' compensation court of appeals, and courts shall recognize as valid and binding a provision in a collective bargaining agreement between a qualified employer or qualified groups of employers engaged in construction, construction maintenance, and related activities and the certified and exclusive representative of its employees to establish certain obligations and procedures relating to workers' compensation. For purposes of this section, "qualified employer" means any self-insured employer, any employer, through itself or any affiliate as defined in section 60D.15, subdivision 2, who is responsible for the first $100,000 or more of any claim, or a private employer developing or projecting an annual workers' compensation premium, in Minnesota, of $250,000 or more. For purposes of this section, a "qualified group of employers" means a group of private employers engaged in workers' compensation group self-insurance complying with chapter 79A, or a group of private employers who purchase workers' compensation insurance as a group, which develops or projects annual workers' compensation insurance premiums of $2,000,000 or more. This agreement must be limited

to, but need not include, all of the following:
(a) an alternative dispute resolution system to supplement, modify, or replace the procedural or dispute resolution provisions of this chapter. The system may include mediation, arbitration, or other dispute resolution proceedings, the results of which may be final and binding upon the parties. A system of arbitration shall provide that the decision of the arbiter is subject to review either by the workers' compensation court of appeals in the same manner as an award or order of a compensation judge or, in lieu of review by the workers' compensation court of appeals, by the office of administrative hearings, by the district court, by the Minnesota court of appeals, or by the supreme court in the same manner as the workers' compensation court of appeals and may provide that any arbiter's award disapproved by a court be referred back to the arbiter for reconsideration and possible modification;
(b) an agreed list of providers of medical treatment that may be the exclusive source of all medical and related treatment provided under this chapter which need not be certified under section 176.1351;
(c) the use of a limited list of impartial physicians to conduct independent medical examinations;
(d) the creation of a light duty, modified job, or return to work program;
(e) the use of a limited list of individuals and companies for the establishment of vocational rehabilitation or retraining programs which list is not subject to the requirements of section 176.102;
(f) the establishment of safety committees and safety procedures; or
(g) the adoption of a 24–hour health care coverage plan if a 24–hour plan pilot project is authorized by law, according to the terms and conditions authorized by that law.

(codified at Minn.Stat. § 176.1812, subd. 2 (2002)).[6] Any agreement that "diminishes an employee's entitlement to benefits" is null and void. *Id.* (codified at Minn.Stat. § 176.1812, subd. 4 (2002)).[7]

As indicated earlier, Kline's union and Berg Drywall, as part of a collective bargaining agreement, adopted an ADR system that provides for a three-step process: facilitation, mediation, and arbitration. Fund R. 3.1. At the facilitation stage, the facilitator communicates with the parties and not with legal counsel; and although a party may retain legal counsel at any time, legal counsel is excluded from the facilitation unless all parties agree otherwise. *Id.* at Rs. 3.2, 3.4. A party dissatisfied with the determination of a facilitator may apply for mediation. *Id.* at R. 3.4. At the mediation stage, either party may be accompanied by legal counsel, but the media-

tor communicates directly with the parties and not through legal counsel. *Id.* at R. 5.4. If the dispute is not resolved at the mediation stage, the dispute may proceed to arbitration. *Id.* at R. 6.1. Legal counsel apparently is permitted to participate in the arbitration; and attorney fees are determined by the arbitrator and paid in accordance with the Workers' Compensation Act. *See id.* at R. 6.3. The decision of the arbitrator may be appealed to the WCCA; but the decision of the WCCA is not appealable. Union Constr. Crafts Workers' Comp. Fund R. 6.5 (2001).

## II.

■ Respondents' employer and insurer and the amicus curiae maintain that we lack jurisdiction over this dispute because the Rules and Regulations of the Union Construction Crafts Workers' Compensa-

6. Minnesota Statutes § 176.1812, subdivision 2, provides:

A copy of the agreement and the approximate number of employees who will be covered under it must be filed with the commissioner. Within 21 days of receipt of an agreement, the commissioner shall·review the agreement for compliance with this section and the benefit provisions of this chapter and notify the parties of any additional information required or any recommended modification that would bring the agreement into compliance. Upon receipt of any requested information or modification, the commissioner must notify the parties within 21 days whether the agreement is in compliance with this section and the benefit provisions of this chapter.

In order for any agreement to remain in effect, it must provide for a timely and accurate method of reporting to the commissioner necessary information regarding service cost and utilization to enable the commissioner to annually report to the legislature. The information provided to the commissioner must include aggregate data on the:

(i) person hours and payroll covered by agreements filed;

(ii) number of claims filed;

(iii) average cost per claim;

(iv) number of litigated claims, including the number of claims submitted to arbitration, the workers' compensation court of appeals, the office of administrative hearings, the district court, the Minnesota court of appeals or the supreme court;

(v) number of contested claims resolved prior to arbitration;

(vi) projected incurred costs and actual costs of claims;

(vii) employer's safety history;

(viii) number of workers participating in vocational rehabilitation; and

(ix) number of workers participating in light-duty programs.

7. Minnesota Statutes § 176.1812, subdivision 4, provides:

Nothing in this section shall allow any agreement that diminishes an employee's entitlement to benefits as otherwise set forth in this chapter. For the purposes of this section, the procedural rights and dispute resolution agreements under subdivision 1, clauses (a) to (g), are not agreements which diminish an employee's entitlement to benefits. Any agreement that diminishes an employee's entitlement to benefits as set forth in this chapter is null and void.

tion Fund only permit an appeal to the WCCA. The rules do not permit further appeal. Kline contends that he has a constitutional right to appeal.

In authorizing the inclusion of ADR systems in a collective bargaining agreement, the legislature required that the system had to provide for judicial oversight:

A system of arbitration shall provide that the decision of the arbiter is subject to review either by the workers' compensation court of appeals in the same manner as an award or order of a compensation judge or, in lieu of review by the workers' compensation court of appeals, by the office of administrative hearings, by the district court, by the Minnesota court of appeals, or by the supreme court in the same manner as the workers' compensation court of appeals and may provide that any arbiter's award disapproved by a court be referred back to the arbiter for reconsideration and possible modification.

Minn.Stat. § 176.1812, subd. 1(a). Respondents and amicus curiae read the "or" and "in lieu of" language as permitting limitation of judicial review. But as Kline points out, the statute also says that the arbitrator's decision shall be "subject to review" by the WCCA "in the same manner as an award or order" of a compensation judge. Decisions of the WCCA, under the Workers' Compensation Act, are subject to review by this court. Minn.Stat. § 176.471, subd. 1.

■■■ Due process, "when applied to judicial proceedings means a course of legal conduct consonant with rules and principles established in our system of jurisprudence for the protection and enforcement of private rights." *Hunter v. Zenith Dredge Co.,* 220 Minn. 318, 326, 19 N.W.2d 795, 799 (1945). Due process requires "the right of appeal from or review of a decision regarded by a litigant as

unjust." *Id.* The administrative procedures created to implement workers' compensation laws survived constitutional separation of powers concerns, in part, because the agency's awards and determinations were subject to review by this court. *Breimhorst,* 227 Minn. at 433, 35 N.W.2d at 734.

■■■ A workers' compensation claim is not a private personal injury claim against the employer and the insurance carrier. *Monson v. White Bear Mitsubishi,* 663 N.W.2d 534, 538 (Minn.2003). Workers' compensation " 'is social legislation, providing a measure of security to workers injured on the job, with the burden of that expense considered a proportionate part of the expense of production.' " *Id.* at 539 (quoting *Franke v. Fabcon, Inc.,* 509 N.W.2d 373, 376 (Minn.1993)):

[T]he entire compensation system has been set up and paid for, not by the parties, but by the public. The public has ultimately borne the costs of compensation protection in the price of the product, and it has done so for the specific purpose of avoiding having the disabled victims of industry thrown on private charity or public relief. To this end, the public has enacted into law a scale of benefits that will forestall such destitution.

8 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 132.04(1) (2003). Accordingly, the resolution of workers' compensation disputes is not a purely private concern. Traditionally, the binding resolution of those disputes is exclusively a public function. The statutory authorization for private ADRs essentially delegates the quasi-judicial function of the agency to private parties, making actions of those parties in that capacity state action. *Cf. Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 625, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (stating, "If a

government confers on a private body the power to choose the government's employees or officials, the private body will be bound by the constitutional mandate of race neutrality."); *Smith v. Allwright,* 321 U.S. 649, 660, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (stating, "[T]he recognition of the place of the primary in the electoral scheme makes clear that state delegation to a party of the power to fix the qualifications of primary elections is delegation of a state function that may make the party's action the action of the [s]tate.").

It is important to understand that this case is not about an employee and employer, in the face of a legal problem, making a mutually voluntary decision to pursue arbitration in lieu of dispute resolution in the workers' compensation system. In the collective bargaining context, arbitrators perform functions different from those performed by courts:

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law-the practices of the industry and the shop-is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted produc-

tion under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

*United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 581–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

Given the unique nature of the collective bargaining process, the Court held in *United Steelworkers v. American Manufacturing Co.*:

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

363 U.S. 564, 567–68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

Although initially reluctant to do so, the Court eventually extended its commercial arbitration precedent to claims under the Age Discrimination in Employment Act (ADEA). *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). As a condition of employment, a registered securities representative had signed a uniform securities registration statement that required him to " 'arbitrate any dispute, claim or controversy.' " *Id.* at 23, 111 S.Ct. 1647. The Court held that the representative's ADEA claim was subject to compulsory arbitration: "[B]y agreeing to ar-

bitrate a statutory claim [an employee] does not forgo the substantive rights afforded by the statute; [he] only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer*, 500 U.S. at 26, 35, 111 S.Ct. 1647 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action, the statute will continue to serve both its remedial and deterrent function." *Id.* at 28, 111 S.Ct. 1647 (alterations in original) (quoting *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. 3346). For arbitration of statutory claims to be enforceable, minimum standards of procedural fairness require sufficient judicial review to ensure compliance with governing laws. *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1487 (D.C.Cir.1997).

Respondents and amicus curiae apparently agree that due process requires that a dispute resolution system provide some level of judicial review, but they take the position that review by the WCCA is sufficient. The WCCA, however, is an agency in the executive branch of government. Minn.Stat. § 175A.01, subd. 1. Moreover, the WCCA is of limited jurisdiction, having authority only to determine matters within the workers' compensation system. Minn. Stat. § 175A.01, subd. 5 (2002) (stating the WCCA has no authority "in any case that

does not arise under the workers' compensation laws of the state"). In declining to address the merits of the constitutional claim Kline raised here, the WCCA acknowledged that it did not have authority to rule on that claim. *See Irwin v. Surdyk's Liquor*, 599 N.W.2d 132, 135 (Minn. 1999).

■■ The presumption is that a statute is constitutional, and we are required to place a construction on the statute that will find it so if at all possible. *In re Cold Spring Granite Co.*, 271 Minn. 460, 467, 136 N.W.2d 782, 787 (1965) (stating, "If the act is reasonably susceptible of two different constructions, one of which would render it constitutional and the other unconstitutional, we must adopt the one making it constitutional."). It seems highly doubtful that the legislature intended the limitation of review of an arbitrator's decision to the WCCA, particularly when such a limitation necessarily implicates due process and separation of powers concerns. Accordingly, we conclude that Minn.Stat. § 176.1812, subd. 1(a), does not authorize preclusion of judicial review.[8]

### III.

■■ The amicus curiae also asserts that we do not have jurisdiction over this dispute because the ADR process is part of the larger collective bargaining agreement and is governed by federal law.[9]

---

8. The dissent acknowledges that judicial review cannot be precluded, but asserts that judicial review is available under the Minnesota Uniform Arbitration Act. Neither respondents' employer and insurer nor the amicus curiae make that claim. Furthermore, when read literally, Minn.Stat. § 176.1812, subd. 1(a), authorizes review "in the same manner as the workers' compensation court of appeals" in the district court or court of appeals; but having transferred adjudication of compensation claims to the Department of Labor and Industry in 1921, "it is rather

doubtful the legislature intended to march these awards through the general jurisdiction court system." *See Peterson v. O.R. Anderberg Const.*, 586 N.W.2d 269, 272 n. 3 (Minn. 1998).

9. Because an amicus must accept the case before the court with the issues made by the parties, an amicus ordinarily cannot inject new issues into a case that have not been presented by the parties. But a court may, at times, consider an issue raised only by an amicus, particularly if the issue is one the court could raise sua sponte. *E.g., Teague v.*

Section 301 of the Labor Management Relations Act makes private sector collective bargaining agreements enforceable in federal court. That section vests jurisdiction in federal courts over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a) (2001). Section 301 preempts claims in which resolution of the dispute "is substantially dependant upon analysis of the terms of [a collective bargaining agreement]." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).

 However, section 301 does not preempt a claim alleging state law substantive rights that apply without regard to the collective bargaining agreement and can be resolved without interpreting a collective bargaining agreement. *See Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 412–13, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). Section 301 "cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law[.] * * * [W]hen the meaning of contract terms is not the subject of a dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw,* 512 U.S. 107, 123–24, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). If the claim is based on state law and there is no dispute over the terms of the collective bargaining agreement, section 301 preemption is not mandated. *Gregory v. SCIE, LLC,* 317 F.3d 1050, 1053–54 (9th Cir.2003). Inasmuch as Kline's claims are based on state law and there is no dispute as to the

contract terms, the claims are not preempted by 29 U.S.C. § 185(a).

## IV.

 Kline asserts that the exclusion of legal counsel from the early stages of dispute resolution under the Fund's ADR process results in the diminution of benefits, in violation of Minn.Stat. § 176.1812, subd. 4 (providing, "Nothing in this section shall allow any agreement that diminishes an employee's entitlement to benefits as otherwise set forth in this chapter."). He claims that legal representation in the early stages of the process is essential and that, when compared with the statutory system that protects injured workers from excessive charges and at the same time ensures that counsel receive adequate compensation for their services, the exclusion of legal counsel is a diminished benefit. He also asserts a due process right to counsel.

From the time injured workers' common law rights to sue their employers were abrogated, the Workers' Compensation Act has contemplated the right to be represented by counsel in proceedings to secure compensation. *See* Minn.Stat. § 8201 (1913) (attorney fees as lien on compensation). The workers' compensation system is inherently adversarial. Moscowitz & Van Bourg, *supra* at 36. There is a claimant and a defendant (the employer and insurance carrier). *Id.* The workers' compensation judge "must determine if the defendant must pay compensation to the claimant." *Id.* Common issues involved in a typical workers' compensation claim include: (1) whether the injury arose out of and in the course of employment; (2) whether there is, in fact, an injury; (3) whether a preexisting condition was aggravated or exacerbated by the employment;

*Lane,* 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (considering retroactivity

claim raised only by amicus).

(4) the nature, extent, and cessation of a temporary total disability; (5) the nature and extent of a permanent partial disability; (6) questions related to rehabilitation and medical treatment; and (7) questions related to death and dependency benefits. *Id.* at 12–13. The stated aim of the ADR process involved in this case is to change "the culture of workers' compensation claims administration from one of adversaries and lengthy litigation to a culture of fairness and quick resolution of the claim." Fund Executive Summary at 1 (rev. May 2000). But a "quick glance" at "just the most common issues litigated in a workers' compensation claim * * * clearly demonstrates that the workers' compensation system can be extremely adversarial." Moscowitz & Van Bourg, *supra* at 13.

▮▮▮ Also, over the years, workers' compensation has become more complex, having gone through major reforms and leading to the need to consult one set of laws for injuries occurring before December 31, 1983, another set of laws for injuries occurring between January 1, 1984, and September 30, 1995, and a third set of laws for injuries occurring after October 1, 1995. *See* Act of June 7, 1983, ch. 290, § 176, 1983 Minn. Laws 1405; Act of May 25, 1995, ch. 231, art. 1, § 37, 1995 Minn. Laws 1999.[10] Ascertaining which law applies also can be problematic in that " 'the substantive rights of [the] employer and [the] employee are fixed * * * by the law in effect on the date of the controlling event.' " *Busch v. Advanced Maint.*, 659 N.W.2d 772, 776 (2003) (alterations in orig-

**10.** For example, "[f]or injury producing temporary total disability, the compensation is 66–2/3 percent of the weekly wage at the time of injury." Minn.Stat. § 176.101, subd. 1(a) (2002). For injuries occurring on or after January 1, 1984, temporary total disability compensation ceases 90 days after the worker attains maximum medical improvement or 90 days after the end of an approved retraining program, whichever is later. Act of June 7, 1983, ch. 290, § 48, 1983 Minn. Laws 1341 (codified at Minn.Stat. § 176.101, subd. 3e (1994)). During the 90–day period, if the employer furnishes or procures work that satisfies statutory criteria, permanent partial disability compensation is payable as impairment compensation. If no work satisfying statutory criteria is found for the employee, compensation for permanent partial disability is payable as economic recovery compensation that may be significantly higher than impairment compensation. Act of June 7, 1983, ch. 290, §§ 44–45, 59, 1983 Minn. Laws 1339–40, 1346 (codified at Minn.Stat. § 176.101, subds. 3a, 3b, 3p (1994)).

For injuries occurring on or after October 1, 1995, temporary total disability compensation still ceases 90 days after maximum medical improvement, but job placement is not an issue because the two-tier system for the delivery of permanent partial disability benefits has been eliminated, making compensation for permanent partial disability payable under one schedule. Act of May 25, 1995, ch. 231, art. 1, §§ 17, 19, 1995 Minn. Laws 1988–89 (codified at Minn.Stat. § 176.101 subds. 1(j) and 2a (2002)). There are also several other cessation provisions. *Id.* at 1987 (codified at Minn.Stat. § 176.101, subd. 1(e) (2002)) (providing that temporary total benefits cease when the employee returns to work); *id.* (codified at Minn.Stat. § 176.101, subd. 1(f) (2002)) (providing that temporary total benefits cease when the employee withdraws from the labor market); *id.* at 1987–88 (codified at Minn.Stat. § 176.101, subd. 1(g) (2002)) (providing that temporary total benefits cease when the employee fails to make a diligent search for work); *id.* at 1988 (codified at Minn.Stat. § 176.101, subd. 1(h) (2002)) (providing that temporary total benefits cease when the employee has been released to work without restrictions); *id.* (codified at Minn. Stat. § 176.101, subd. 1(i) (2002)) (providing that temporary total benefits cease when the employee refuses an offer of work). There is an absolute limitation of 104 weeks of temporary total disability benefits. *Id.* (codified at Minn.Stat. § 176.101, subd. 1(k) (1996)). The 104–week limitation does not apply to temporary total disability that is paid during an approved retraining plan. *Id.* The weeks before and after the retraining plan do, however, count against the 104–week limitation. *Id.*

inal) (quoting *Joyce,* 412 N.W.2d at 307). Normally, it is the date of the most recent occurrence of a compensable personal injury that is the controlling event, but "[i]f a period of disability is precipitated by a mere temporary aggravation of a prior injury, * * * 'as opposed to a new, separate injury, the original injury continues to be the controlling event and the employee's rights are governed by the [law] in effect on the date of the original injury.'" *Id.* at 776–77 (quoting *Joyce,* 412 N.W.2d at 307–08).

Respondents and amicus curiae assert that the absence of legal counsel at the early stages of the ADR process does not diminish an employee's entitlement to benefits and, in fact, the employee in this case retained legal counsel before the facilitation meeting. But, as Kline notes, legal counsel cannot aid in the presentation of evidence and argument at the facilitation stage unless all parties agree and can only indirectly participate at the mediation phase. An injured worker is immediately disadvantaged, particularly when a trained insurance claims adjuster or an employer with legal training is allowed to participate in a facilitation that can lead to the termination of benefits. "The removal of legal representation for an injured employee only exacerbates the already present unequal bargaining power of the employee." Starr, *supra* at 514.

Moreover, there is no provision for attorney fees for services rendered in connection with a facilitation. Fees are only allowable in connection with a mediation that results in settlement. Fund R. 5.4. Following arbitration, the arbitrator determines fees. *Id.* at R. 6.3. In the workers' compensation system, attorney fees are regulated by statute. Minn.Stat. § 176.081 (2002). The collection of fees in excess of those authorized by statute is serious misconduct warranting discipline. *Strande v. Woman's Club of Minneapolis,* 518 N.W.2d 555, 556 (Minn.1994). In a "privatized system," the collection of fees "would be outside the scope of the workers' compensation system." Moscowitz & Van Bourg, *supra* at 45.[11] While an injured employee is allowed to consult with legal counsel in the early stages of the process, this consultation might be at the employee's own expense. An injured employee might be reluctant to retain a workers' compensation attorney until such time as the attorney could participate in the process, and a workers' compensation attorney might be reluctant to furnish legal services when that attorney's ability to fully represent the client is diminished by the system.

It seems fairly evident that legal representation in the early stages of dispute resolution in workers' compensation matters is vital. The statutory scheme endeavors to accommodate the public policy that injured employees have access to representation by legal counsel knowledgeable in the intricacies of the legal and medical questions necessary to structure the employee's case. *See Mack v. City of Minneapolis,* 333 N.W.2d 744, 749 (Minn.1983) (stating that the statutory scheme is aimed at "(1) protecting compensation claimants from excessive legal fees which might otherwise severely deplete funds badly needed by the employee and his or her dependents; and (2) insuring that attorneys who represent claimants will receive reasonable compensation, so that competent counsel will be available to injured employees.").

---

**11.** Amicus points out that the ADR process provides for "the availability of counsel, paid by the Fund, to review proposed settlement agreements." If mediation results in a settlement agreement and the employee does not have legal counsel, the Fund will pay $500 to an attorney of the employee's choice to review the settlement. Fund R. 5.4.

But the exclusion of legal representation and passing the costs of legal representation onto the injured worker serve only to dissuade injured employees from seeking competent legal help and to discourage attorneys from furnishing appropriate services, resulting in diminution of an injured employee's entitlement to benefits as otherwise set out in the statutory scheme.[12] We therefore hold that the exclusion of legal counsel in the early stages of the ADR process contained in the Fund's rules violates Minn.Stat. § 176.1812, subd. 4, and that Kline is entitled to a new arbitration. In light of our disposition, we need not reach the constitutional claim.

## V.

Kline also claims bias and conflict of interest in the arbitration. Kathy Berg, manager/owner of Berg Drywall and a management trustee of the Fund, attended the arbitration. Kline contends that Berg's dual roles as party and trustee created an inherent conflict of interest, or at least the appearance of a conflict of interest. In rejecting this claim, the WCCA, on the record presented here, saw no inherent bias and conflict of interest in the selection of the arbitrator or approval of his compensation. We are satisfied the WCCA properly decided the issue.

Affirmed as modified.

Employee is awarded $1,600 in attorney fees.

---

**12.** The dissent suggests that the opt-out legislation was aimed at reducing the costs of litigation, asserting that the presence of attorneys adds 25 percent to those costs; but the impact of attorney involvement on the costs of benefits claims was merely "a belief among industry, and many legislatures." Starr, *supra* at 494. Claimants' attorneys have been the major target of recent reforms to the benefit process, resulting in a drop in legal representation for claimants at contested case

HANSON, Justice, (dissenting).

I respectfully dissent. I would discharge the writ of certiorari on the grounds that Kline has waived his right to review by this court because he is bound by the rules of the Fund, which expressly limit the parties to a single appellate review and which select the WCCA to provide that review. Kline is bound by the waiver contained in those rules because the rules were agreed to by his union in a collective bargaining agreement, as authorized by Minn.Stat. § 176.1812 (2002).[1] The majority's refusal to enforce the rules of the Fund will place Minnesota at odds with all of the other states that have implemented comparable reforms to their workers' compensation systems. More importantly, it will deny to the Minnesota legislature, which had the broad power to create the workers' compensation system in the first instance, the ability to correct aspects of that system that are no longer achieving their original purpose.

## I. *The Purposes of Section 176.1812*

I view the enactment of section 176.1812 as an appropriate effort by the legislature to redirect the workers' compensation system to its original purpose of providing a timely and cost-effective process for the determination and payment of workers' claims. That effort was not undertaken in isolation, but reflects the recognition in many states that the formal claims process

hearings, while the insurers' legal representation remained unchanged. *See* Martha T. McCluskey, *The Illusion of Efficiency in Workers' Compensation Reform*, 50 Rutgers L.Rev. 657, 861–62 (1998).

**1.** Kline does not argue that he is not bound by the collective bargaining agreement of his union. *See Tynan v. KSTP, Inc.,* 247 Minn. 168, 77 N.W.2d 200, 205 (Minn.1956).

has grown overly complex, adversarial and expensive. At stake is the ability of employers to remain competitive within their region, which in turn benefits workers and their unions by adding or retaining jobs.

## A. National Workers' Compensation Reform

Beginning in the early 1990's, major reform efforts were undertaken in several states to introduce or expand alternate dispute resolution mechanisms in the workers' compensation system. These efforts, often referred to as the privatization of workers' compensation, were designed to reduce the cost of the system without decreasing benefits, by offering an alternative to the formal hearing process.[2] The formal process was perceived to be too complex, too expensive and too slow.[3]

Although there were some variations in the several state reform measures, all shared a common format of introducing ADR mechanisms to streamline the process. Some states provided broadly for voluntary mediation or arbitration when agreed to by an individual claimant and the employer. *See, e.g.*, Mass. Gen. Laws Ann. ch. 152, §§ 10B–10C (2004); Mo.Rev. Stat. § 287.460 (2004); S.D. Codified Laws § 62–7–37 (2004).[4] Other states more narrowly authorized workers to opt out of the formal claims process by creating ADR systems in collective bargaining agreements made by the workers' union with "qualified employers." To date, eleven states, including Minnesota, have adopted this latter mechanism.[5]

Until today, none of these states has upheld any challenge to the authority of its legislature to enact such a reform or to the constitutionality of the private ADR mechanisms that have been created by the various collective bargaining agreements. For example, in California, a claimant alleged that the denial of access to the formal claim process violated the state constitution by creating an "encumbrance" on the workers' compensation system. *Costa v. Workers' Comp.App. Bd.*, 65 Cal.App.4th 1177, 77 Cal.Rptr.2d 289 (1998). The court rejected that challenge, holding that the legislature's broad powers to create a compensation system included the power to reform the system by authorizing the creation of ADR systems in collective bar-

---

**2.** This reform effort is well summarized in Linda J. Starr, Note, *Injured on the Job: Using Alternative Dispute Resolution to Improve Workers' Compensation in Minnesota*, 18 Hamline J. Publ. L & Pol'y 487 (1997) (cited hereafter as "Starr").

**3.** In Minnesota, for example, an employer may require an injured worker to go through several formal stages, including negotiations with a compensation insurance adjuster, settlement conferences at the department of workers' compensation, pretrial or settlement conference before a compensation judge, a hearing before a compensation judge, an appeal to the Workers' Compensation Court of Appeals (WCCA) and review by the Minnesota Supreme Court. *See* Minn.Stat. §§ 176.305, subd. 1a; 176.106, subd. 7; 176.341; Minn. Stat. 176.351; 176.421; 176.471 (2002). Each of these stages adds costs and delay without adding benefits.

**4.** Minnesota statutes do not specifically permit ADR based on agreement between individual employees and employers. Presumably, an employee and employer could opt to use ADR to facilitate a settlement, but such a settlement would remain subject to the supervision of the commission under Minn.Stat. § 176.521 (2002).

**5.** Cal. Labor Code §§§ 3201.5, 3201.7, 3201.8 (West 2004); Fla. Stat. § 440.211 (2004); Haw.Rev.Stat. ch. 386 (2004); Ky.Rev.Stat. Ann. § 342.277 (Baldwin 2003); Me.Rev.Stat. Ann. Tit. 39–A, § 110 (West 2003); Md.Code Ann. Lab. & Empl. § 9–104 (2004); Mass. Gen. Laws ch. 152, § 10C (2004); Minn.Stat. § 176.1812 (2004); N.Y. Workers' Comp. Law §§ 20, 25 (McKinney 2004); Or.Rev.Stat. §§ 656.170, 656.174 (2001); Pa. Stat. Ann. tit. 77, § 1000.6 (West.2004).

gaining agreements. *Costa*, 77 Cal. Rptr.2d at 294.

### B. Minnesota's Enactment of Reform Measures

Prior to the enactment of section 176.1812, Minnesota was reported to have one of the highest workers' compensation cost structures in the upper Midwest, with insurance rates of 30 to 40 percent higher than neighboring states like Wisconsin. *See* Dennis J. McGrath, *Workers' Comp Bill Passes; 13 DFLers Cross Line in Senate Plan*, Star Tribune, May 20, 1995, at 1A; Scott Carlson, *Minnesota Companies' Workers' Comp. Costs Expected to Drop in 1996, Saint Paul Pioneer Press*, September 9, 1995, at 1C. Faced with this competitive disadvantage, the legislature enacted section 176.1812 to offer workers who were members of unions that bargained with "qualified employers" the opportunity to opt out of the formal claims system in favor of a more streamlined, less costly ADR system.

Section 176.1812 is narrow. It does not apply to all workers' compensation claims. Instead, it only authorizes the creation of ADR systems in collective bargaining agreements made by unions with "qualified employers" or "qualified groups of employers," (essentially those who are self-insured or whose annual premiums exceed high threshold levels). Minn.Stat. § 176.1812, subd. 1. Section 176.1812 is also optional. It provides that the parties to collective bargaining agreements may continue to use the formal process or may choose to establish an ADR system that will "supplement, modify, or replace" the formal claims' process. Minn.Stat. § 176.1812, subd. 1(a).

### C. Waiver of a Second Appellate Review

One of the important cost-reducing features of section 176.1812 is that it authorizes the parties to streamline appellate review of a claim by limiting it to one review, to be provided:

> either by the workers' compensation court of appeals in the same manner as an award or order of a compensation judge or, in lieu of review by the workers' compensation court of appeals, by the office of administrative hearings, by the district court, by the Minnesota court of appeals, or by the supreme court, in the same manner as the workers' compensation court of appeals * * *.

Minn.Stat. § 176.1812, subd. 1(a). This language authorizes the parties to provide for appellate review by selecting any one of the listed bodies and, conversely, to waive the right to appellate review by any of the other listed bodies.

Kline's union opted to waive appellate review by this court when it entered into a collective bargaining agreement that adopted Rule 6.5 of the Fund. By doing so, Kline's union selected the WCCA as the body to provide appellate review and waived the right to appellate review by any other body.

### D. Judicial Review under the Uniform Arbitration Act

The decision of Kline's union to select an executive branch court to provide the single appellate review, and to waive a second appellate review by any judicial branch court, does not mean that there could be no judicial review of an arbitration award. Separate judicial review is always available to a worker under the Minnesota Uniform Arbitration Act (MUAA). The MUAA, which applies to all voluntary arbitration agreements, provides for judicial review to affirm, vacate, modify or correct an arbitration award. Minn.Stat. § 572.18–.20 (2002). The MUAA applies to an arbitra-

tion that is conducted under an arbitration clause contained in a collective bargaining agreement. *Eisen v. State,* 352 N.W.2d 731, 734 (Minn.1984).

Of course, the scope of judicial review under the MUAA is narrow. The MUAA authorizes a court to vacate an award only where it (1) was "procured by corruption, fraud or other undue means"; (2) the arbitrator was partial or corrupt or engaged in prejudicial misconduct; (3) the "arbitrators exceeded their powers"; (4) "[t]he arbitrators refused to postpone the hearing upon sufficient cause * * * or refused to hear evidence material to the controversy" or conducted the hearing "to prejudice substantially the rights of a party"; or (5) "[t]here was no arbitration agreement * * *." Minn.Stat. § 572.19. subd. 1. Further, the procedure for seeking review under the MUAA is a petition to the district court, which generally is to be filed within 90 days after receiving a copy of the award. Minn.Stat. § 572.19, subds. 1, 2.

Thus, the precise issue before this court is not whether the rules of the Fund can preclude judicial review. Judicial review was available to Kline in the district court under the MUAA and the rules of the Fund do not purport to override the MUAA. The issue before this court is only whether the parties to a collective bargaining agreement can voluntarily adopt ADR rules that waive a second, broader form of judicial review by limiting direct appellate review to the WCCA. That issue turns on the scope of the authorization of private ADR systems granted by the legislature in section 176.1812, which in part depends on whether there are any constitutional impediments to a broad grant of authority.

## II. *Constitutional Concerns with Section 176.1812*

The majority opinion weaves together a series of constitutional "concerns" to sup-port a narrow construction of section 176.1812—"It seems highly doubtful that the legislature intended the limitation of review of an arbitrator's decision to the WCCA, particularly where such a limitation necessarily implicates due process and separation of powers concerns." But those constitutional concerns are without merit, essentially because the establishment of a private ADR system in a collective bargaining agreement is optional and does not involve state action or the delegation of judicial power to a state executive agency. To the contrary, the establishment of a private ADR system in a collective bargaining agreement constitutes a voluntary waiver of those constitutional concerns, and that waiver is binding on all union workers.

### A. *The Supreme Court's Constitutional Jurisdiction*

Kline misconstrues the effect of section 176.1812 by arguing that the legislature cannot eliminate or reduce the jurisdiction given to this court under Minnesota's constitution. While it undoubtedly is true that the legislature could not enact laws that would reduce this court's subject matter jurisdiction, section 176.1812 does not attempt to do so. Instead, the section authorizes unions and employers, by private agreement, to create ADR systems that waive the right to resort to this court's jurisdiction. The section has no impact on and does not alter this court's jurisdiction under the constitution.

Of course, the judicial branch has an inherent interest in providing a forum for the resolution of justiceable controversies, but the judiciary does not require, or even permit, parties to bring claims that are not justiceable, as where the parties have waived their right to court review. This principle was best articulated by the Maryland court as follows:

The scope of a judicial proceeding may be narrowed by the agreement of the parties and thus without an act of the Legislature. In the absence of procedural rules or statute, the parties themselves may, by agreement, limit the issues that a court will consider within a given dispute. Examples of such agreements include a proceeding on stipulated facts, the pre-trial entry of a consent order defining the issues for trial, or a more formal arbitration agreement under which the parties agree to limited judicial review of the arbitration determination.

*Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 836 A.2d 655, 675 n. 12 (2003). It also was recognized by this court in *Falgren v. State Bd. of Teaching*, 545 N.W.2d 901, 906 (Minn.1996). There we held that a teacher who chose to have his discharge heard before an arbitrator rather than his school board was entitled only to the narrow judicial review of the arbitrators award provided by the MUAA and had waived his right to the broader judicial review that would have been available on appeal from a decision of the school board. *Id.* at 905–06.

## B. Due Process and Separation of Powers

Kline makes both due process and separation of powers' arguments in support of his claim that section 176.1812 could not preclude a second appellate review by this court. We have said that due process requires "the right of appeal from or review of a decision regarded by a litigant as unjust," *Hunter v. Zenith Dredge Co.*, 220 Minn. 318, 326, 19 N.W.2d 795, 799 (1945), and separation of powers makes it necessary for the legislature to provide the right to judicial review of compensation determinations made by executive branch judges, *Breimhorst v. Beckman*, 227 Minn. 409, 433, 35 N.W.2d 719, 734 (1949). But these principles do not apply where a party has waived the right to a particular form of judicial review and where the compensation determinations are made by a private arbitrator, not by an executive branch judge.

### 1. Waiver

It is well established that a private party may waive the right of judicial review or a particular form of review. In fact, the situation here strongly parallels that present in *Falgren*, where we said:

> Falgren had a choice whether to contest his discharge in a hearing before the school board or before an arbitrator. Falgren chose a hearing before an arbitrator. Thus, we agree with the Board; by choosing to have his discharge heard before an arbitrator, Falgren waived his rights to broader judicial review. Along with whatever benefits Falgren felt his decision to have his termination hearing before an arbitrator offered, he must also accept the drawbacks.

545 N.W.2d at 906. Similarly here, Kline (acting through his union) had a choice to contest his compensation claim before a compensation judge or an arbitrator. The choice of a compensation judge would have provided for broader appellate review by this court on appeal from a decision of the WCCA. But the choice of an arbitrator, by agreeing to adopt the rules of the Fund, means that only one direct appellate review will be provided, by the WCCA, and the only judicial review available is the narrow review of a motion to vacate the award under the MUAA. *See* Minn.Stat. § 572.19, subd. 1. By opting for arbitration, Kline retained the narrow judicial review available under the MUAA but waived the broader judicial review that would otherwise have been available under the workers' compensation laws.

### 2. State Action

In addition, the creation of a private ADR system does not present due process or separation of powers concerns because it does not involve state action. Two Florida decisions directly addressed the "state action" issue in connection with constitutional challenges to similar workers' compensation reform. In *Gassner v. Bechtel Constr.*, 702 So.2d 548 (Fla.Dist.Ct.App. 1997), the court affirmed the decision of the compensation judge that she lacked jurisdiction because Gassner's exclusive remedy was to follow the ADR procedures adopted in the collective bargaining agreement. The court stated:

> Finally, appellant contends that section 440.211, Florida Statutes (1995), is unconstitutional to the extent it allows the collective bargaining agreement to establish an alternative dispute resolution system that diminishes procedural protections chapter 440 would otherwise afford a claimant. A great many such diminutions are alleged, including some that pertain to resolving disputes concerning attorney's fees. Denial of equal protection, deprivation of due process and of the right to counsel, in violation of both state and federal constitutions, are all claimed. Mr. Gassner also argues that the failure of the judge of compensation claims to assume jurisdiction denied him access to court, in violation of article I, section 21 of the Florida Constitution.
>
> All of these arguments overlook the fact that the collective bargaining agreement between Bechtel and Mr. Gassner's union does not constitute state action. *See generally Kintzele v. J.B. & Sons, Inc.*, 658 So.2d 130, 132 (Fla. 1st DCA 1995) ("The parties themselves confer jurisdiction in arbitration proceedings by the agreements they make.").
>
> \* \* \* \*

> As a matter of constitutional law, permitting private parties to establish dispute resolution procedures by contract violates no provision of the Florida Constitution, and is not the sort of state action to which the Fourteenth Amendment speaks.

*Id.* at 554.

Similarly, in *Ariston v. Allied Bldg. Crafts*, 825 So.2d 435, 437–38 (Fla.Dist.Ct. App.2002), the court affirmed the dismissal of a petition for compensation benefits because the collective bargaining agreement required the claimant to use the ADR procedures. In rejecting the claimant's argument that his union could not waive his right to a judicial forum, the court said that any principle against waiver by the union did not apply because

> the legislature both established the workers' compensation system *and* enacted section 440.211, expressly approving the development by employers and unions of alternative systems of resolving compensation disputes. [The claimant's] union did not bargain away his inviolable right to utilize chapter 440; the legislature declared that it is not an inviolable right, and instead permitted the [collective bargaining agreement] mechanism to provide the only avenue for recovery of compensation benefits.

*Id.* at 437.

#### a. Social considerations

The majority suggests that state action may be found because of society's interest in the workers' compensation system. To the extent that the workers' compensation system is the product of "social legislation," it should be enough to say that, under separation of powers, the social aspects of that system are best addressed by the legislature, not by the court, and the legislature did address those social aspects when it enacted section 176.1812. The

court should not substitute its view of the social utility of the use of private ADR systems for workers' compensation claims for the view already expressed by the legislature when it authorized those systems in section 176.1812.

Moreover, in a case relied upon by the majority, the United States Supreme Court determined that there was no conflict between the use of arbitration and the social policies that underlie a statutory claim:

> As [appellant] contends, the [Age Discrimination in Employment Act] is designed not only to address individual grievances, but also to further important social policies. We do not perceive any inherent inconsistency between those policies, however, and enforcing agreements to arbitrate age discrimination claims. It is true that arbitration focuses on specific disputes between the parties involved. The same can be said, however, of judicial resolution of claims. Both of these dispute resolution mechanisms nevertheless also can further broader social purposes.

*Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 27, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (internal citations omitted).

### b. Delegation of governmental functions

The majority suggests that "[t]he statutory authorization for private ADRs essentially delegates the quasi-judicial function of the agency to private parties, making actions of those parties in that capacity state action." But the cases relied upon by the majority do not support that proposition. In both *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 625, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) and *Smith v. Allwright,* 321 U.S. 649, 660, 64 S.Ct. 757, 88 L.Ed. 987 (1944), the govern-

ment had delegated to a private party the power to perform an essential governmental function. *Edmonson* dealt with the use of peremptory challenges to assist in the selection of a jury in a civil trial. 500 U.S. at 623–24, 111 S.Ct. 2077. The Court noted that a jury is a "quintessential governmental body, having no attributes of a private actor." *Id.* at 624, 111 S.Ct. 2077. *Smith* dealt with the use of primary elections to select nominees for the general election. 321 U.S. at 652–53, 64 S.Ct. 757. The Court observed that "[p]rimary elections are conducted by the [political] party under state statutory authority" and extensive state regulation, which makes the political party "an agency of the state in so far as it determines the participants in a primary election." 321 U.S. at 663, 64 S.Ct. 757.

In contrast, section 176.1812 does not authorize private parties to perform an essential governmental function. Instead, it authorizes private parties to opt out of the governmental process. This, of course, is why arbitration is called "alternative dispute resolution"—it does not use the governmental system (in this case, the executive branch quasi-judicial system) but provides a private alternative. The resolution of a private dispute is a role that the government will perform when the parties have not agreed otherwise, but it is not an essential governmental function that should be imposed on parties that have agreed to an alternative mechanism. To the contrary, this court has actively encouraged the use of ADR mechanisms and they are widely used to resolve private disputes of all kinds.

### c. Statutory claims

The majority suggests that state action exists because the compensation claim being arbitrated is a "statutory claim." But this ignores the clear statement in *Edmon-*

*son* that the "private use of state-sanctioned private remedies does not rise, by itself, to the level of state action." 500 U.S. at 622, 111 S.Ct. 2077. And the primary authority relied upon by the majority for this proposition actually supports the opposite conclusion. In *Gilmer*, the Court held that a statutory claim under the Age Discrimination in Employment Act may be the subject of an arbitration agreement. 500 U.S. at 35, 111 S.Ct. 1647. The Court stated, "Although all statutory claims may not be appropriate for arbitration, '[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory right at issue.'" 500 U.S. at 26, 111 S.Ct. 1647 quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The Court went on to say that the burden was on the party opposing arbitration "to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims." *Id.* The Court held that, although the ADEA did not expressly authorize arbitration, there was nothing in the text or the legislative history that precluded it and arbitration was not inconsistent with the purposes of the Act. *Id.* at 26–27, 111 S.Ct. 1647.[6]

Here, we do not need to speculate about whether the legislature intended to allow the parties to waive a judicial forum because section 176.1812 says so expressly.

### d. Breimhorst

Finally, the majority notes that "[t]he administrative procedures created to implement workers' compensation laws survived constitutional separation of powers concerns, in part, because the agency's awards and determinations were subject to review by this court." (*citing Breimhorst*, 227 Minn. at 433, 35 N.W.2d at 734). While this proposition is correct in the abstract, it has no application here because it only applies to *legislative action* that precludes judicial review of decisions of an *executive agency*. It does not apply to the agreements of private parties that waive the right to a broader form of judicial review of decisions made by a private arbitrator.

The legislative authorization for private parties to adopt an ADR system does not vest quasi-judicial powers in any executive agency. Instead, it allows private parties to avoid the quasi-judicial powers of the agency, submit their disputes to an ADR process and waive the right they would otherwise have to obtain a broader form of judicial review of any award. Moreover, the legislative authorization is purely permissive. Workers and their unions are not required to adopt any ADR system, but can continue to use the formal claims process. Thus, the authorization and approval of private agreements that create ADR systems does not constitute "state action," and does not provide a basis for a separation of powers' claim.

Further, as noted earlier, judicial review of the arbitrator's award is available under the MUAA. Section 176.1812 does not preclude that judicial review; it only authorizes the parties to agree to waive a second form of judicial review by limiting direct appellate review to the WCCA.

---

**6.** As noted in *Gilmer*, the Court has also approved the use of arbitration to enforce other statutory claims, such as antitrust, securities and RICO. *Gilmer*, 500 U.S. at 31, 111 S.Ct. 1647. Similarly, the Court has held that private enforcement of state statutory claims is not state action. *See, e.g., Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 165, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

### III. The Plain Meaning of Section 176.1812

If these constitutional concerns have no substance, then they likewise should have no influence on the construction of the section 176.1812. Instead, that section should be construed according to the plain meaning of its words. *See* Minn.Stat. § 645.16 (2002); *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn.2001). The plain meaning of the words used in section 176.1812 is that the legislative authorization to create ADR systems in collective bargaining agreements includes the authorization to adopt an ADR system that does not include an appeal to this court.

First, subdivision 1(a) states that the ADR system may "modify, or replace the procedural or dispute resolution provisions of this chapter." This suggests that the parties can agree to bypass all procedural provisions, including the provision for appeal from the WCCA to this court.

Second, subdivision 1(a) states that the ADR system may provide that the decision of the arbitrator is subject to review "either" by the WCCA "or, in lieu of review by the [WCCA]," by the office of administrative hearings, by the district court, by the Minnesota court of appeals, or by the supreme court." The words "either" and "or, in lieu of" make clear that the statute contemplates only one appellate review, which can be restricted to any one of the bodies mentioned, such as a restriction to the WCCA.[7] And the body selected to perform the single appellate review need not be "judicial" because the statute specifically authorizes the selection of the WCCA.

Kline argues that the addition of the words, that any review by the WCCA is to be "in the same manner as an award or order of a compensation judge," implies

the right to a second review by the supreme court because such a second review would be available for a decision of the WCCA that is based on an order of a compensation judge. But these words can only reasonably be read to incorporate the scope of review that is normally used by the WCCA, not the entire statutory appellate process. This is made clear by the inclusion of the same words, "in the same manner as the [WCCA]," in describing the review that would be conducted by the supreme court if the ADR procedure provided for a single review by this court. Minn.Stat. § 176.1812. Obviously, any review by the supreme court would be final and these words could not be read to imply a second review by any other body.

Finally, Kline argues that the limitation of review to the WCCA makes the agreement void under subdivision 4 of section 176.1812 because it would diminish the procedural rights of a claimant from those available in formal claims proceedings before a compensation judge or on appeal from a decision of a compensation judge. But the prohibition in subdivision 4 against diminishing an "employee's entitlement to benefits" refers to the schedule of benefits that are authorized by the Act, not to the procedural rules. As stated in *Gassner*, the argument that procedural differences between the ADR system and the Act might diminish an employee's entitlement to benefits "reveals significant confusion about the distinction [the statute] draws between benefits and (alternative) procedures." 702 So.2d at 552. The court noted that ADR procedures would necessarily be different because they were created as "alternatives." *Id.* The court stated:

> If, as appellant argues, the agreement creates procedural requirements for the receipt of benefits that [the statute] does

---

7. The word "either" is appropriately "used before the first of two (or occasionally more)

alternatives that are being specified." *New Oxford American Dictionary* 546 (2001).

not impose, the agreement also creates procedural opportunities for the provision of benefits that [the statute] does not afford. As long as the benefits themselves are undiminished, the requirements of [the statute] are met.

*Id.* at 552–53.

The words of subdivision 4 of the Minnesota statute are even clearer than the Florida statute relied on in *Gassner.* The Minnesota statute includes language similar to the Florida statute but adds another sentence that provides a specific exemption for the procedural aspects of the ADR rules. It states:

> For purposes of this section, the procedural rights and dispute resolution agreements under subdivision 1, clauses (a) to (g), are not agreements which diminish an employee's entitlement to benefits.

Minn.Stat. § 176.1812, subd 4.

### IV. *Right to Counsel*

Because I conclude that Kline has waived the right to review by this court of the decisions of the WCCA, I would not reach Kline's claim that he was denied due process because his counsel was not allowed to be present at the facilitation.

Further, if I were to review that question, I would conclude that a worker's compensation claimant does not have a due process right to legal representation at the facilitation stage of an ADR process where the terms of the collective-bargaining agreement preclude counsel at that stage. Parties may waive their right to counsel in virtually all legal settings, including those having more serious ramifications than a workers' compensation claim. By virtue of the adoption of the rules of the Fund in the collective bargaining agreement, and the provision in the rules that counsel cannot be present at the facilitation, Kline has

waived the right to have counsel present at that stage.

Finally, as noted earlier, because Kline's waiver is part of a private agreement that created the ADR systems, there is no "state action" and due process issues cannot arise.

BLATZ, Chief Justice, (dissenting).

I join in the dissent of Justice Hanson.